**Lawrence R. ALBERTI, et al.,
Plaintiffs-Appellees,**

**v.**

**Johnny KLEVENHAGEN, Sheriff of
Harris County, Texas, et al.,
Defendants,**

**Johnny Klevenhagen, Sheriff of Harris
County, Texas, and Harris County
Commissioners Court, Defendants-Appellants.**

**No. 85–2036.**

United States Court of Appeals,
Fifth Circuit.

June 4, 1986.

Mike Driscoll, Co. Atty., Houston, Tex., for Klevenhagen.

Roderick O. Lawrence and Lupe Salinas, Asst. Co. Attys., Houston, Tex., for Harris County.

James T. Oitzinger, Bruce V. Griffiths, Attys., Greater Houston Chapter of Am. Civil Liberties Union, Houston, Tex., for plaintiffs-appellees.

Before BROWN, REAVLEY, and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

Pursuant to its continuing jurisdiction in a class action complaining of conditions in Harris County jails, the district court found constitutional violations and ordered implementation of a new plan for staffing and inmate supervision. The evidence amply supports the district court's finding that a high level of violence exists in the jails, and the district court properly determined that

these conditions violated the Eighth Amendment. The remedy ordered was an adequate and proper corrective measure. Accordingly, we affirm the order of the district court in all respects.

## I. PRIOR PROCEEDINGS

In 1972 Lawrence Alberti and others filed a class action on behalf of past, present, and future inmates of the jails of Harris County, Texas. The suit named as defendants members of the Harris County Commissioners Court and the Harris County Sheriff's Department. The inmates sued pursuant to 42 U.S.C. § 1983, alleging numerous violations of their constitutional and statutory rights as the result of defendants' operation and maintenance of Harris County detention facilities.

In February 1975 the parties agreed to and the district court entered a consent judgment. The agreement called for an upgrading of the existing facilities and contemplated construction of a new central jail. The Commissioners Court agreed to provide sufficient guards and other staff to assure security for the jails without the use of inmate assistance. The Sheriff similarly agreed to employ a sufficient and adequately trained staff, including guards and deputies to assure the protection of inmates. The district court retained jurisdiction to issue further interim orders.

The defendants' compliance with the consent judgment soon came into question, and in December 1975 the district court after holding hearings issued a broad remedial order. *Alberti v. Sheriff of Harris County*, 406 F.Supp. 649 (S.D.Tex.1975). Among other findings, the district court determined that guards and staff in the jails were insufficient in number and inadequately trained, leading to frequent violence and homosexual assault among the inmates. *Id.* at 658. The court ordered adequate training and pay increases for jail personnel, and ordered that staffing be increased to provide one jailer for every twenty inmates. *Id.* at 678.

In 1978 the district court reluctantly approved plans for a new central jail prepared by the Commissioners Court. The plans provided for multiple occupancy in the form of four person cells and twenty-four person dormitories, rather than the single inmate cells advocated by plaintiffs. The court found that the jail design did not itself violate minimum constitutional standards, but warned that the new jail might not be safely occupied without providing additional staffing. The court expressly conditioned its approval upon the defendants' satisfaction of their continuing obligations to provide adequate staffing and to comply with other constitutional requisites.

In late 1982 and early 1983 the district court held hearings to determine appropriate staffing for the newly opened central jail and the detention center. The court ordered that staffing plans be prepared by the Sheriff's Department to meet the approval of the Texas Commission on Jail Standards (TCJS), which at the time required a one to forty-five ratio of corrections officers to inmates. The court approved a staffing plan, at the insistence of the defendants, that incorporated the one to forty-five staffing ratio. The court found that the facilities were not then meeting this level, but accepted the defendants' assurance that compliance would be achieved by the end of June 1983.

In August 1983 plaintiffs filed a motion for contempt, alleging that staffing still did not meet the levels required by the court. However, members of the Commissioners Court and the Sheriff's Department successfully petitioned the TCJS to exempt the Harris County jails from adherence to any numerical ratio of staff to inmates. The Sheriff's Department independently developed its own "post staffing plan" which received approval by the TCJS in October 1983, although the new plan required far fewer guards than the one to forty-five ratio. The defendants later moved to modify the court's previous staffing order.

In July and September 1984 the district court heard evidence on the plaintiffs' motion for contempt and the defendants' motion to modify. The court heard testimony from numerous inmates, expert witnesses,

guards, and other staff. In rendering its decision in December, the court determined that the high level of violence in the jails violated Eighth Amendment standards. *Alberti v. Heard,* 600 F.Supp. 443, 457 (S.D.Tex.1984). The court abandoned the ratio concept of staffing and instead ordered the implementation of a staffing plan similar to one proposed by plaintiffs' experts. The court's plan called for approximately the same total number of guards as the 1983 one to forty-five order, but it specified a different scheme for the number of guards posted on each floor of the jail at each shift.[1] *Id.* at 460-61. The court further ordered that deputies visit inmate cells at least once an hour. *Id.* at 462.

Members of the Sheriff's Department and the Commissioners Court now appeal the December 1984 order. They argue first that the evidence presented at the hearings was insufficient to permit the district court to find that the conditions in the jails violated constitutional standards. Second, they contend that the new staffing plan ordered by the court exceeded what is required to remedy any such constitutional violations.

## II. CONSTITUTIONAL STANDARDS

We note initially the cautionary principle that a federal court should not, under the guise of enforcing constitutional standards, assume the superintendence of jail administration. *Jones v. Diamond,* 636 F.2d 1364, 1368 (5th Cir.1981) (en banc) (citing *Miller v. Carson,* 563 F.2d 741 (5th Cir.1977)); *Williams v. Edwards,* 547 F.2d 1206 (5th Cir.1977), *cert. dismissed sub nom. Ledbetter v. Jones,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981). The relevant inquiries "spring from constitutional requirements ... rather than a court's idea of how best to operate a detention facility." *Bell v. Wolfish,* 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447, 469 (1979). The district court expressly recognized its limited

role in this litigation. 600 F.Supp. at 456–57.

These limitations do not mean, however, that federal courts must adopt a " 'hands-off' approach to problems of jail administration." *Bell,* 441 U.S. at 562, 99 S.Ct. at 1886, 60 L.Ed.2d at 483. "There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935, 950 (1974). "A prisoner, whether already convicted of a crime or merely awaiting trial, does not shed all his constitutional rights when he puts on jail clothing." *Jones,* 636 F.2d at 1368. We therefore next set out the standard used to draw the line between permissible correction of unconstitutional conditions and impermissible jail administration.

The Eighth Amendment imposes the constitutional limitation upon punishments: they cannot be "cruel and unusual." This is a flexible standard: "[n]o static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' " *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59, 68 (1984) (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630, 642 (1958) (plurality opinion)). While an Eighth Amendment determination must not be merely a judge's subjective views, the Constitution contemplates that ultimately a court's own judgment will be brought to bear on the question. *Id.* 452 U.S. at 346, 101 S.Ct. at 2399, 69 L.Ed.2d at 68–69.

■ Jail conditions must not fall below a minimum standard of decency required by the Eighth Amendment. Conditions which "alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities ... could be cruel and unusual under the contemporary standard of decency ...." *Id.* 452 U.S. at 347, 101

---

**1.** For a comparison of the 1983 staffing order, the Sheriff's Department's plan, defendants' expert's plan (the Cox plan), and the plaintiffs' experts' plan (the Benton/Stoughton plan), see Appendix A to the 1984 district court opinion. 600 F.Supp. at 465.

S.Ct. at 2399, 69 L.Ed.2d at 69 (citing *Estelle v. Gamble*, 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251, 259–60 (1976)). In determining the constitutional question, we need not separately weigh each of the challenged institutional practices and conditions, for we instead look to "the totality of conditions." *Ruiz v. Estelle*, 679 F.2d 1115, 1139 (5th Cir.) [*Ruiz VII*], *modified on other grounds*, 688 F.2d 266 (5th Cir.1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). "The totality of conditions of confinement does not offend the Constitution unless prison conditions are cruel and unusual, not merely harsh and restrictive." *Id.* at 1140.

■ Violence and sexual assault among inmates may rise to a level rendering conditions cruel and unusual. In *Jones*, we found confinement in a prison "where terror reigns" to be violative of the Eighth Amendment. 636 F.2d at 1373. "A prisoner has a right to be protected from the constant threat of violence and from sexual assault." *Id.* Other factors are relevant in the constitutional determination, *e.g.*, *Gates v. Collier*, 501 F.2d 1291, 1309 (5th Cir.1974), but the level of violence and sexual assault may alone suffice to support a finding of liability under the Eighth Amendment. *See Stokes v. Delcambre*, 710 F.2d 1120, 1125 (5th Cir.1983).

■ While Eighth Amendment standards protect those inmates convicted of committing crimes, we note that the Harris County jails also house large numbers of inmates who are awaiting trial and have been unable to secure release. The Due Process Clause of the Fourteenth Amendment accords state pretrial detainees rights not available to convicted inmates. *Jones*, 636 F.2d 1368. "Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment." *Wolfish*, 441 U.S. at 535 n. 16, 99 S.Ct. at 1872 n. 16, 60 L.Ed.2d at 466 n. 16. However, since incarceration necessarily imposes restrictions on pretrial detainees, such restrictions are valid, absent an intent to punish, if "reasonably related to a legitimate governmental objective" rather than "arbitrary or purposeless." *Id.* 441 U.S. at 539, 99 S.Ct. at 1874, 60 L.Ed.2d at 468.

The parties do not challenge the district court's formulation of the constitutional standard. Although the district court did not expressly recognize the greater rights accorded to pretrial detainees, the court found deprivations of rights of inmates under the Eighth Amendment. Where dealing with the constitutionally rooted duty of jailers to provide their prisoners reasonable protection from injury at the hands of fellow inmates, "we need not dwell on the differences in rights enjoyed by pre-trial detainees and convicted persons or the maturation of prisoners' rights in general." *Stokes*, 710 F.2d at 1124. The same conditions of violence and sexual abuse which constitute cruel and unusual punishment may also render the confinement of pretrial detainees punishment per se. *See Jones*, 636 F.2d at 1374. We now move to the first contested issue: whether the evidence presented to the district court established a constitutional violation by the above standards.

### III. EVIDENCE OF JAIL CONDITIONS

The district court after lengthy hearings concluded that "[i]nmate beatings and homosexual rapes and attacks are prevalent." 600 F.Supp. at 457. The court attributed the rampant violence to defects in physical design and manner of operation of both the new jail and the detention center. These defects included inadequate staffing, inadequate supervisory techniques, poor sightlines, and an unreliable communication system. The result was "a continuous pattern of deprivations which clearly reach constitutional dimensions." *Id.*

The appropriate standard of review is our next concern. We review the facts found by the district court under the clearly erroneous standard. Fed.R.Civ.P. 52. "A finding is 'clearly erroneous' when although there is evidence to support it, the

reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed.2d 746, 766 (1948). However, once the facts are established, the issue of whether these facts constitute a violation of constitutional rights is a question of law that may be assayed anew upon appeal. *See Hatton v. Wicks*, 744 F.2d 501, 503 (5th Cir.1984); *Shillingford v. Holmes*, 634 F.2d 263, 265–66 (5th Cir.1981). Thus, the existence of the challenged conditions in the jails presents a question of fact to be reversed only if clearly erroneous; we bring our own judgment to bear on whether these conditions constitute cruel and unusual punishment.

We hold that the evidence amply supports the factual conclusions of the district court. We recite the incidents of violence and sexual assault which follow not to exhaustively catalog conditions in the jails but to provide examples of the nature of evidence presented at the hearings. We need not determine whether any of these incidents individually constituted an Eighth Amendment violation, for the evidence established that the totality of the circumstances in the jails were condemnable.

One inmate testified that he was sexually assaulted while serving a sentence for a misdemeanor involving misuse of a credit card. He reported that another inmate, who had been refused by his own "wife" or homosexual lover, made sexual advances toward him. He testified that the aggressor hit him repeatedly over a period of two hours and ultimately forced him to perform oral sex. According to his testimony, he did not see a guard until two days later, when the aggressor was pulled from the cell block for raping another inmate.

A second inmate, a pretrial detainee, testified that he witnessed a fight between two other inmates and attempted to call a deputy. One of these other inmates began to beat him and he was unable to summon help for over an hour. The deputy who eventually arrived apparently misapprehended the situation, threatening him with disciplinary action, but a disciplinary committee later exonerated him. This inmate was later again the target of violence when an inmate who had previously tried to provoke him suddenly attacked him while he slept. He suffered a ruptured spleen and massive internal bleeding as a result of this attack. He was subject to further harassment and torture by the same aggressor for a two-week period before undergoing emergency surgery for his injuries.

A female inmate testified that she witnessed another inmate being beaten repeatedly. This victim, after her head was beaten against the cell bars, complained to a guard but was allegedly told to keep quiet. The following morning the same victim was attacked while showering by other inmates wielding razors and broken broomsticks. A guard arrived, some fifteen to twenty minutes later, and removed one of the aggressors. This witness also testified that she was unable to attract the prompt attention of guards when other inmates suffered medical problems.

Another inmate filed a statement that was later admitted in evidence during the hearings. This inmate, a young Hispanic who spoke no English, reported being beaten over a fifteen-day period. Other inmates placed toilet paper between his toes while he slept and lit it with matches. He reported awaking on several other occasions with other inmates rubbing their genitals in his face. He resisted their demands, and they continued to beat him. He did not file any criminal charges, but requested to be put in another cell.

Numerous other inmates reported serious acts of violence. Incidents like the four recited above are examples of the pattern of physical and sexual assault experienced by inmates. A medical assistant working at the central jail testified that fights broke out "all the time." An expert witness called by the defendants testified that, based on his experience with similar jails, "sexual abuse and threats of sexual abuse are high in this institution." One of the plaintiffs' experts estimated that over

1200 acts of violence were reported by inmates every year. Another of plaintiffs' experts testified that the actual number of sexual assaults may be five to six times greater than the reported number of such incidents.

The district court's reluctance to accept reported incidents of violence in the jail as the sole measure of conditions in the jail was well founded. The evidence supported the court's conclusion that reported violence may have been only "the tip of the iceberg," for inmates testified to an unwritten code of silence resulting in many incidents going unreported. Often violence occurred when guards were beyond reach, and aggressive inmates threatened weaker ones with more violence if they reported attacks. As another federal judge has noted, "[f]ear of reprisal, desire not to be known as a 'snitch' and, in the case of homosexual attacks, reluctance to identify oneself as an 'easy mark' deter victims from reporting such attacks." *Doe v. District of Columbia,* 701 F.2d 948, 966 (D.C. Cir.1983) (separate statement of Edwards, J.).

We recognize that inmate reports of violence and sexual assault are subject to question and their worth turns to a great extent on the alleged victim's credibility. For several of the incidents conflicting testimony was presented as to the length of time inmates went unobserved and unsupervised by guards and as to victims' opportunities to attract the attention of guards. We note only that ample evidence supported the findings of the district court; we do not attempt a reappraisal of the credibility of witnesses or a different resolution of conflicts in the testimony. *See Olgin v. Darnell,* 664 F.2d 107, 108 (5th Cir.1981).

A substantial dispute arose between the parties below on the availability of meaningful statistics with which to compare the level of violence and sexual assault within the jails to such levels at other correctional facilities as well as to outside, non-correctional communities. Since the total capacity of the jails is over 4,000, and over 60,000 individuals may pass through the jails annually, it is proper and relevant to inquire whether the estimated 1,200 reported acts of violence warrant a conclusion that violence was prevalent. Quantitative measures are significant, for Eighth Amendment determinations must be informed by objective factors to the extent possible. *See Rhodes v. Chapman,* 452 U.S. at 346, 101 S.Ct. at 2399, 69 L.Ed.2d at 69.

Nevertheless, the statistics here have proven too unreliable to leave us with a definite and firm conviction that the district court erred. Since other evidence indicated reported incidents to be only "the tip of the iceberg," any statistics which do not attempt to take account of the possibly vast number of unreported acts are subject to a wide margin of error. In addition, using the total annual population of the jails as a baseline may be deceptive, for many of the 60,000 who are booked into the jails stay for only brief periods before gaining their release. Moreover, even an accurate statistic would be of little use in making comparisons to other institutions and communities unless reporting methods and other variables were controlled, which does not appear to be the case here. Inconclusive statistical comparisons will do little to attack an otherwise well supported district court finding. *See Ruiz VII,* 679 F.2d at 1142.

▊ We conclude, as a matter of law, that the level of violence and sexual assault found to be existing in the Harris County jails constitutes a violation of the Eighth Amendment. The relevant standards of *Jones,* that there be a "constant threat of violence and sexual assault" in an institution "where terror reigns," are satisfied here. *See* 636 F.2d at 1373. It is not necessary that every inmate be assaulted every day before a federal court may intervene. The pattern of violence in the Harris County jails, coupled with such inadequate supervision, creates a constant threat to the inmates' safety.

## IV. REMEDY

The relief ordered by the district court dealt with both staffing levels and frequen-

cy of observation of inmates. 600 F.Supp. at 460–62. The detailed plan required specific numbers of guards on duty on each floor for each shift. In general, the plan called for two guards in each quadrant on each floor, allowing one guard to enter inmate sleeping areas while another guard acts as a back-up. The plan requires guards to "visit" inmate cells at least once per hour.[2]

■ A district court has wide, yet not unbounded discretion in fashioning a remedy once a constitutional violation is discovered. *See Ruiz VII*, 679 F.2d at 1144–45. That discretion is not unlimited, for the remedy must be tailored to the underlying cruel and unusual conditions. "[T]he nature of the violation determines the scope of the remedy." *Id.* at 1145 (quoting *Swann v. Charlotte-Mecklenberg Bd. of Educ.* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554, 567 (1971)). The district court may not provide a "warranty of pleasant conditions," but can only order relief sufficient to correct the violations discovered. *Id.*

■ Another factor limiting the district court's discretion is the concern of federalism. This guiding principle of our judicial system calls for minimum intrusion by federal courts into the affairs of state correctional facilities. *E.g. Ruiz v. Estelle*, 650 F.2d 555, 571 (5th Cir.1981) [*Ruiz V*]. After a district court orders the correction of constitutional violations, the details of compliance are often left to state officials. *Id.* Thus, principles of federalism require "the least intrusive remedy that will still be effective." *Ruiz VII*, 679 F.2d at 1145 (quoting Special Project, *The Remedial*

*Process in Institutional Reform Litigation*, 78 Colum.L.Rev. 784, 869 (1978)).

■ We find that the district court acted properly in rejecting competing staffing plans. The defendants apparently never complied with the one to forty-five ratio adopted in May 1983, and they later conceded that it was inflexible and inefficient. The new TCJS standards allowed a waiver of a specific ratio requirement, which the defendants promptly sought to take advantage of, and permitted the substitution of a vague "adequate and reasonable" staffing requirement. The district court properly concluded that the new TCJS rule gave "no professional guidance whatsoever on jail staffing standards." 600 F.Supp. at 449. Neither of these alternatives offered the promise of being an effective remedy.

Likewise, the post staffing plans proffered by the Sheriff's Department and the defendants' expert were shown by substantial evidence to be unworkable. Although similar to the scheme proposed by the plaintiffs in that they specified the numbers of guards by floor and by shift, both of these plans called for staffing at far reduced levels. The Sheriff's Department's plan was apparently deemed inadequate by the defendants' own expert, for he added significant numbers of guards in formulating his plan. His plan, in turn, would have been adequate only if significant numbers of inmates were "racked out," or locked out of their cells into a central area during much of the day to allow greater supervision than the poor sightlines would otherwise permit. The evidence supported the district court's conclusion that "racking out" was disruptive,

---

**2.** The requirement that guards "visit" inmate cells, standing by itself, is somewhat ambiguous. To understand this requirement it is necessary to briefly explain the floor plan of a typical inmate living area. Inmates are housed in several "tanks" on each floor of the central jail. Each tank is composed of a central dayroom, off of which are a number of individual cells where the inmates sleep. Entry into the tank is gained by a security door at one end of the tank. Elsewhere the district court's opinion speaks of "observation of inmates" or "visual inspections

of the cells." Thus, we construe the court's order as requiring on an hourly basis not actual physical entry of every individual cell but rather entry of an area, such as the dayrooms, from which visual inspection of the interior of each cell may be made. None of the parties have challenged this provision as ambiguous, all apparently assuming the construction we have made of the court's order. We express no opinion on the permissibility of requiring hourly physical entry of individual cells.

counterproductive, and a poor substitute for adequate numbers of personnel.

As for the portion of the order requiring hourly inspections, we conclude that the district court took only the minimum steps required for an effective solution. Evidence indicated that fights and sexual abuse occurred for hours or even days without effective staff intervention. An electronic call-button system, intended to allow inmates to summon assistance in emergencies, was often inoperative; when operative, intimidation of weaker inmates often prevented its use; when used, response time ranged from immediate to forty-five minutes to no response at all. The design of the new central jail rendered visual inspection of inmates difficult without entry into the dayrooms outside inmate's cells.[3] The district court properly concluded that there was no substitute under the circumstances for frequent visual inspections.

■ The requirement of visual inspections, notwithstanding defendants' assertions to the contrary, does not constitute an unnecessarily intrusive "pro-active," therapeutic, or rehabilitative program. We recognize that the lack of a rehabilitative program does not by itself constitute cruel and unusual punishment, nor does the Eighth Amendment require the provision of every amenity needed to avoid mental, physical, or emotional deterioration. *See Newman v. Alabama*, 559 F.2d 283, 291 (5th Cir.1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). The district court stated the recommendation of the plaintiffs' expert that observation of inmates should include the noting of "physical appearance, emotional changes, body language, and pairing among inmates," with an eye toward anticipating future risks. 600 F.Supp. at 455. However, the court ordered no such detailed observa-

tions, requiring only an hourly "visit" of the inmates' cells. 600 F.Supp. at 462. Court-ordered visits by guards are a permissible element of relief. *See, e.g., Smith v. Sullivan*, 553 F.2d 373, 380 (5th Cir. 1977) (hourly visit requirement upheld).

## V. NOTICE

The defendants have tersely asserted in one of their briefs and have emphasized in oral argument a purported lack of notice regarding the 1984 hearings which formed the evidentiary basis of the order currently on review. Specifically, they claim that going into the hearings they had no notice that they would be charged with an Eighth Amendment violation. The underlying plaintiffs' motion for contempt allegedly did not alert them to such an issue, for it raised only questions of compliance with the May 1983 order. The defendants claim that their misapprehension of the scope of the hearings constituted a denial of due process.

■ We need not address the requirements of due process concerning notice of the scope of a hearing, for the record demonstrates that the defendants' claim of lack of notice is frivolous. An order six months prior to the hearings stated their scope would include evaluation of the new TCJS standards as well as the "possibility of implementation of federal constitutional staffing standards." The defendants' own pretrial memorandum of law regarding staffing issues was devoted entirely to a discussion of Eighth Amendment standards for staffing and the level of violence. The joint pretrial order made numerous references to Eighth Amendment standards. While the original purpose of the motion for contempt may have been to enforce compliance with a prior order, it was clear to all parties, far in advance of the hear-

---

3. We note that the Sheriff's Department has recognized the need for frequent visual inspections of inmates. The Sheriff's Department prepared Post Orders for the jails, dated July 9, 1984, which require deputies to "[perform] irregularly but at a frequency not less than hourly a full and complete inspection of each cellblock and/or cell to observe directly the condition of each inmate assigned to the Wing." This requirement was apparently promulgated to comply with TCJS rules. The defendants do not contend that no cell inspections should be made, but instead contest their frequency and nature.

ings, that Eighth Amendment violations would be a central issue.

## VI. OMBUDSMAN

This Court at oral argument raised the issue of the propriety of the plaintiffs' attorney acting as a court-appointed ombudsman. The district court established the Office of the Ombudsman in its December 1975 order, and named two of the plaintiffs' attorneys to lead it. 406 F.Supp. at 678. The court detailed the ombudsman's duties as monitoring compliance with the consent judgment and subsequent order regarding pretrial release, jail overcrowding, and other jail conditions. The ombudsman was to submit periodic reports directly to the court on the pretrial release issue, report to the court "at any time" on the overcrowding issue with recommendations for improvements, and "similarly monitor and report upon defendants' efforts" to improve jail conditions in general. *Id.* The court specifically permitted the ombudsman to continue to represent the plaintiffs as their counsel. The order creating the ombudsman was not appealed.

The defendants now contend that the plaintiffs' counsel's dual role as advocate and as ombudsman is improper. They argue that an ombudsman must perform his duties objectively, and that an attorney's role is in conflict with such duties. They contend that the powers of the ombudsman unfairly enhance the plaintiffs' counsel's role as inmate advocate. According to defendants, the district court erred below in a prior order which failed to clarify the division of fees between the Office of the Ombudsman and the plaintiffs' counsel.[4] The defendants now seek the removal of plaintiffs' counsel from the Office of the Ombudsman.

We note first that the purported conflict in the role of attorney/ombudsman has never been raised in the district court. While the defendants claim they once requested the district court to clarify the attorney and ombudsman fees, they have

never before made the broadly based attack they seek to pursue now. Specifically, they have never objected to the plaintiffs' attorney acting as ombudsman, nor have they ever sought his removal from this office. In the thirteen year history of this litigation, ten of which have proceeded since the appointment of the ombudsman, the defendants have silently acquiesced.

As a general rule, issues must be presented to the trial court to receive appellate consideration unless to ignore them would result in a "fundamental miscarriage of justice," *see Mitchell v. M.D. Anderson Hospital,* 679 F.2d 88, 91–92 (5th Cir.1982), or a "grave injustice," *see Masat v. United States,* 745 F.2d 985, 988 (5th Cir.1984). "This court is solely a court of appeals, and its powers are limited to reviewing issues raised in, and decided by, the trial court." *Id.* We have neither the power nor the inclination to substitute ourselves for the district court by reviewing afresh every issue of potential dispute without heed to whether it was raised below.

■ We hold that plaintiffs' counsel's dual role as advocate and ombudsman has not worked a miscarriage of justice or a grave injustice upon the defendants. The role of ombudsman in this case is substantially more limited than those of court-appointed agents in other prison litigation. For example, in the *Ruiz* litigation, the "special master," as contemplated by Fed. R.Civ.P. 53, was given powers that were quasijudicial: He was permitted to hold hearings and find facts concerning the defendants' compliance with court orders. *Ruiz VII,* 679 F.2d at 1162. The special master's findings were to be accepted by the court unless clearly erroneous. *Id.* Given these sweeping powers, we acknowledge that such a court-appointed agent must perform his duties "objectively." *Id.* at 1161–62; *Lister v. Commissioners Court, Navarro County,* 566 F.2d 490, 493 (5th Cir.1978).

Since the ombudsman here functioned in a more limited capacity to only report on

4. The defendants did not appeal this order.

the defendants' compliance and assist in the implementation of the district court decree, he assumed one of the plaintiffs' traditional roles. *See Ruiz VII,* 679 F.2d at 1161. It is evident that throughout this litigation the district court and all of the parties recognized and accepted that the ombudsman has functioned as an advocate for the inmates. The district court in appointing the ombudsman did not expressly cite Rule 53, for no quasijudicial office was contemplated. Instead, the court simply formalized the plaintiffs' attorney's role in aiding the enforcement of court decree. The defendants have cited to us no instance in which the ombudsman abused his role by exerting undue influence on the district court or placing the defendants at an unequal footing. The ombudsman here was not a "middleman" or referee between the parties. *Cf. Miller v. Carson,* 563 F.2d 741, 752 (5th Cir.1977) (appointment of magistrate as ombudsman approved where ombudsman's role was as a "middleman" between inmates and staff).

## VII. CONCLUSION

It is regrettable that a federal court is still deeply involved in oversight of the Harris County jails after these thirteen years of litigation. It is more regrettable that after thirteen years conditions in the jails are still in contravention of constitutional standards. Despite the efforts of the parties and the court, inmates continue to be beaten, raped, abused, and assaulted. The district court has acted properly in fashioning new relief for an old malady. Accordingly, we AFFIRM the order of the district court in all respects.

JOHN R. BROWN, Circuit Judge, concurring:

I concur fully in the Court's opinion. I write separately to address two issues in this case which, I believe, may prove to be snares for the unwary in future cases.

The first issue concerns the scope of remedial orders entered under the Eighth Amendment. I believe care must be exercised lest we resort too easily to remedies for the ephemeral "totality of the conditions" in our haste, as judges, to do the right thing as people. The second issue concerns the District Court's decision to appoint counsel for the plaintiffs as its Ombudsman. One of the most fundamental precepts of our judicial system is that each side is entitled to a hearing that is fair both in its appearance and in its effect. While on this record I cannot say that this appointment resulted in any actual prejudice, I believe it comes very close to encroaching upon that precept. I write separately, therefore, to strongly discourage such an appointment in the future.

### Remedial Orders

At the outset, I must emphasize that I find no error either in the opinion of the majority, or in the approach taken by the District Court. I write largely for future guidance in the hope that potential difficulties may be avoided. The temptation to paint with broad brush in Eighth Amendment cases is strong, particularly when the conditions at issue are such that they shock the conscience. *See, e.g., Ruiz v. Estelle,* 679 F.2d 1115 (5th Cir.), *amended in part, vacated in part,* 688 F.2d 266 (5th Cir. 1982); *Gates v. Collier,* 501 F.2d 1291 (5th Cir.1974), *remanded on other grounds,* 522 F.2d 81 (5th Cir.1975) (en banc). The Constitution, however, requires that we temper our sensibilities with an awareness of the very limited role played by the federal courts.

Our task is only to determine whether a constitutional violation has occurred; the function of prison reform is reserved for the other branches of our government. We must not resort to broad remedies for the totality of the conditions as a substitute for careful analysis of the condition actually to be remedied. "The Eighth Amendment is not a basis for broad prison reform. It requires neither that prisons be comfortable nor that they provide every amenity that one might find desirable." *Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir.1982). We are constrained to focus our attention only upon the constitutional violation to be

remedied; the duty to protect inmates' constitutional rights does not confer on us the power to manage prisons. *Ruiz*, 679 F.2d at 1126.

The Court is, of course, correct when it states that analysis of Eighth Amendment claims does not require that we separately weigh each of the challenged institutional practices and conditions. The law in our Circuit, for some years now, has been that we look instead to the totality of the conditions of confinement[1] to determine whether they are cruel and unusual in light of contemporary standards of decency.[2] This test can become quite ephemeral in practice; the courts below must be mindful of the fact that only the specific condition which gives rise to the violation can be remedied. "The court's principal focus must be on specific conditions of confinement. It may not use the totality of all conditions to justify federal intervention requiring remedies more extensive than are required to correct Eighth Amendment violations." *Hoptowit*, 682 F.2d at 1247, *quoting Wright v. Rushen*, 642 F.2d 1129, 1133 (9th Cir.1981).

The fact that the design of the Harris County Jail was inadequate and necessitated increasing staffing levels was not the fault of the Constitution, and the consequential problems to be remedied cannot be laid at the feet of the Federal Judiciary. The District Court here had before it extensive evidence of a high level of violence and sexual assault in the facility. It found that the county had failed to fulfill its constitutional obligations and, therefore, it imposed a remedy carefully tailored to eliminate the unconstitutionally violent conditions. More than that was not required by the Eighth Amendment, and more than that could not have been imposed under the guise of a remedy addressed to the totality of the circumstances.

"Federal courts must be constantly aware of the delicacy of the balance between federal equitable power and state administration of its own law." *Miller v.*

*Carson*, 563 F.2d 741, 748 (5th Cir.1977). We, and the lower federal courts, are courts of limited jurisdiction. Our task is not to correct all social ills, however egregious they may seem to us as individuals. The keys to the Kingdom are not in our hands. Rather, "our task is limited to enforcing constitutional standards and does not embrace superintending prison administration." *Ruiz*, 679 F.2d at 1126. Here, to his credit, the district judge never strayed from his very limited role; in this case, I believe that we have done likewise.

### Appointment of an Ombudsman

As a member of the panel, I raised serious questions regarding the propriety of the District Court's appointment of counsel for the plaintiffs as its Ombudsman. While I agree with the Court that, on consideration of the whole record, this has not resulted in a miscarriage of justice, I would strongly discourage such an appointment in the future. The roles of counsel and ombudsman are simply antithetical; to combine them in the person of a single attorney creates an appearance of unfairness that ill behooves a system premised upon the notion that "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954).

In its order appointing the Ombudsman, the District Court clearly set out the duties incumbent upon the holder of the office.

There shall be an office of Ombudsman established to monitor defendants' efforts in complying with this order and in fulfilling the mandate and requirement of the consent judgment.

We have previously held that an ombudsman is "an arm of the Court." *Miller v. Carson*, 563 F.2d 741, 753 (5th Cir.1977). The function of an ombudsman, as established by our precedents and the order of the court below, is to "observe conditions at the jail and report his observations to the trial court, to assure compliance with

1. *Jones v. Diamond*, 636 F.2d 1364, 1368 (5th Cir.1981) *(en banc)*.

2. *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

the trial court's orders." *Id.* As an arm of the court, the ombudsman has an obligation to behave impartially and to report objectively, for a court "must not assume the role of prosecutor or defender." *Ruiz,* 679 F.2d at 1129.

The role of an ombudsman, however, stands in sharp contrast to that of an advocate. An attorney must zealously represent the interest of the client and must treat those interests as ones of paramount importance. Often that role may not be congruent with the ombudsman's obligation to objectively monitor compliance with the court decree. In cases such as this, the attorney's obligation is to seek the best possible conditions of confinement for the client, even if those conditions exceed the minimum standards required by the Constitution. The Ombudsman, by contrast, is obligated only to ensure that the defendants' conduct comports with the constitutional minima as laid down by the Court. I do not mean to intimate that either role is intrinsically more praiseworthy than the other. I do believe, however, that each role is fundamentally, and inevitably, in tension—if not outright conflict—with the other.

I recognize that we have previously endorsed the appointment of an ombudsman as the kind of procedural innovation necessary to relieve overcrowded federal dockets. *Miller,* 563 F.2d at 752–53. In *Miller,* however, the District Court "had the good judgment to appoint a magistrate as Ombudsman." *Id.* at 752. A magistrate is clearly a judicial officer and has "no interest in or relationship to the parties." *Lister v. Commissioner's Court, Navarro County,* 566 F.2d 490, 493 (5th Cir.1978). The same disinterested objectivity cannot be attributed to an ombudsman who occupies that post and, nonetheless, continues to serve as an attorney for a principal party.

In my view, such inherently conflicting roles should never be combined in the per-

son of a single attorney. "The truth pronounced by Justinian more than a thousand years ago that 'impartiality is the life of justice,' is just as valid today as it was then." *United States v. Brown,* 539 F.2d 467, 469 (5th Cir.1976). I believe that the appointment of a party's attorney to a judicial office casts grave doubt upon the appearance of detached impartiality that is so essential to the functioning of our judicial system. More than that, it subjects employees and agents of the governmental defendants to great uncertainty as the attorney-ombudsman makes his post-judgment rounds in the jail: is he simply the lawyer ferreting out evidence, or is he the Judge's representative, checking to see if the orders are being carried out? Thus, while it has resulted in no actual prejudice in this case, I would strongly discourage such an appointment in the future.[3]

---

**3.** My criticism is addressed to the Judge, not the counsel, whose actions in accepting this role are completely ethical.