**Dorothy CARRIGAN, Plaintiff,**

v.

**STATE OF DELAWARE, by and through its agents, servants and employees, et al., Defendants.**

Civil Action No. 96–8–JJF.

United States District Court, D. Delaware.

Feb. 18, 1997.

---

Martin C. Meltzer, Russ Carmichael, of Martin C. Meltzer, Wilmington, for Plaintiff.

Christopher J. Curtin, of Erisman & Curtin, Wilmington, Gregg E. Wilson, C. Drue Chichi, Deputy Attorneys General, Department of Justice, Wilmington, for Defendants.

## MEMORANDUM OPINION

FARNAN, Chief Judge.

Presently before the Court in this civil rights action are three motions: (1) Motion To Dismiss Of Defendants Taylor, Martin Baylor And Sines (collectively "the Administrative Defendants") (D.I. 14); (2) the Administrative Defendants' Motion For Summary Judgment Against Plaintiff (D.I. 67) and (3) Defendant Peter Davis' Motion For Summary Judgment (D.I. 63). At this stage of the proceedings, the Court will deny the Administrative Defendants' Motion To Dismiss (D.I. 14) as moot and proceed to the merits of the summary judgment motions.[1]

## BACKGROUND

On January 10, 1996, Plaintiff Dorothy Carrigan filed a ten count Complaint alleging claims based on 42 U.S.C. § 1983 and state law against the State of Delaware; the Delaware Department of Correction; Robert Watson, in his official and individual capacity; and several administrative officials of the Delaware Department of Correction in their official and individual capacities; and a former correctional officer, Peter Davis, in his official capacity and individual capacity.[2] On May 10, 1996, Plaintiff dismissed the State of Delaware, the Delaware Department of Correction and all defendants in their official capacities.

Essentially, Plaintiff's Complaint arises out of the alleged rape of Plaintiff by Correctional Officer Peter Davis, who at present, is no longer employed by the Department of Correction. Of the ten counts alleged in Plaintiff's Complaint, six counts are based on 42 U.S.C. § 1983 and are directed at the Administrative Defendants. The remaining four counts of the Complaint are based on state law or are directed at the other Defendants.

In summary, Count I alleges that the Administrative Defendants violated Plaintiff's Eighth Amendment and Fourteenth Amendment rights to be free from cruel and unusual punishment by acting in concert with Defendant Davis to commit the alleged rape, or by being deliberately indifferent to the alleged rape. Count II is directed solely at Defendant Davis and alleges that Defendant Davis violated Plaintiff's Fourth and Fourteenth Amendment rights, privileges and immunities and right to privacy, by compelling Plaintiff to expose her private areas and by having unconsented sexual intercourse with her. Count III alleges that the Administrative Defendants and Defendant Davis failed to provide Plaintiff with secure conditions under 10 Del.Code § 4001. Count IV alleges

---

1. In her Answer to the Administrative Defendants' Motion To Dismiss, Plaintiff filed an appendix containing a number of affidavits and other documentary evidence. In their Reply Brief, Defendants then filed an appendix containing similar evidence. Therefore, the Court could consider the motion and convert it to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(b). However, because of the overlap and extensive briefing in the subsequent summary judgment application, the Court has determined that the better course would be to proceed directly to the instant summary judgment motions.

2. Robert Watson is the former Commissioner of Correction for the State of Delaware. Among the other administrative officials named as Defendants in this lawsuit are: Stanley W. Taylor, former Chief of the Bureau of Prisons and presently Commissioner of Correction for the State of Delaware; Paul Howard, former Warden and present Chief of Bureau of Prisons; Grace Martin, Deputy Warden of WCI; Tom Baylor, Internal Affairs Officer for the Department of Correction; and Jack Sines, Internal Affairs Officer for the Department of Correction.

that the policies and customs of the Administrative Defendants contributed to and/or caused the alleged rape. Count V alleges that the Administrative Defendants violated Plaintiff's Eighth and Fourteenth Amendment rights by transferring Plaintiff to protective custody following her allegation of rape. Count VI alleges that Defendants Baylor and Sines violated Plaintiff's Fifth and Eighth Amendment rights while interviewing Plaintiff regarding the alleged rape. Count VII alleges that deficiencies in policy, training, supervision, and prison conditions, which are in the control of the Administrative Defendants, caused the alleged rape. Count VIII alleges that the Administrative Defendants and Defendant Davis violated Plaintiff's rights under 10 Del.Code § 4001. Count IX alleges that the Administrative Defendants were deliberately indifferent to Plaintiff's medical care following the alleged rape. Finally, Count X alleges a claim solely against the State of Delaware under § 1983; however, this claim has been voluntarily dismissed by Plaintiff.

With this background in mind, the Court will turn to the underlying factual allegations which form the basis of Plaintiff's claims.

## STATEMENT OF FACTS

On March 6, 1995, while incarcerated at the Women's Correctional Institute ("WCI"), Plaintiff claims that she was raped by Defendant Davis. According to Plaintiff, Defendant Davis entered her room while she was taking an afternoon nap, woke her up, and told her to be quiet by placing his finger over her mouth. Then, Defendant Davis allegedly pulled Plaintiff to the end of the bed, and with a condom, engaged in intercourse with Plaintiff without her consent. After the incident, Defendant Davis allegedly tossed the condom on the bed, told Plaintiff to dispose of it and returned to his duties. Rather than disposing of the condom, Plaintiff stored the condom in a cigarette wrapper and placed it in a trash can located in Plaintiff's room.

Later the same day, Plaintiff reported the incident to another inmate, Eloise Slater. Slater assisted Plaintiff in bringing the matter to the attention of the prison administration. On March 9, 1996, Plaintiff was questioned by officers from the Internal Affairs Unit of the Correction Department, and an investigation into Plaintiff's charges followed. During the course of the investigation, Defendants Bailor and Sines conducted interviews of the parties and witnesses. Plaintiff contends that during an interview with her Defendant Bailor threatened her with additional jail time and with prosecution under the law prohibiting sex in prison. Sometime after her interviews, Defendants transferred Plaintiff to Unit 8, a maximum security unit. According to Plaintiff, this transfer was in direct retaliation for her complaints and statements against Defendant Davis.

Shortly after Plaintiff's allegations, the Administrative Defendants contacted the Delaware State Police and a criminal investigation of Defendant Davis was commenced. Defendant Davis admitted to having oral sex with Plaintiff, but claimed that Plaintiff seduced him and the act was consensual. Following his arrest on charges of engaging in sex in a detention facility, Defendant Davis resigned. Currently, the criminal charges against Defendant Davis are pending.

As a result of the alleged rape and ensuing events, Plaintiff claims that she became increasingly agitated. During the time following the alleged rape, Plaintiff was treated by a psychologist, Dudley W. Atkins, from Correctional Medical Services, and by a physician, Dr. Antonio Sacre.

On April 6, 1995, Plaintiff allegedly attempted suicide by jumping off of the second tier of Unit 8. Plaintiff was taken to Riverside Hospital where she was treated for a broken ankle. Upon her return to WCI, Plaintiff was then transferred to Gander Hill prison for suicide watch. Following an emergency motion by Plaintiff's attorney, a state court judge ordered Plaintiff to be transferred to the Delaware State Hospital. Later, Plaintiff was returned to WCI and placed in Unit 8.

In December 1995, Plaintiff was released from WCI. On January 10, 1996, Plaintiff filed the instant lawsuit based on the above described incidents. In September 1996, Plaintiff was returned to WCI on new charges. At the present time, Plaintiff is

incarcerated in the maximum security unit of WCI.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a party is entitled to summary judgment where "the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party always bears the initial responsibility of informing the Court of the basis for its motion, and identifying those portions of the materials, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The moving party is not required to negate the non-movant's claim, but is only required to point out the lack of evidence supporting the non-movant's claim. *Country Floors, Inc. v. Partnership Composed of Gepner & Ford*, 930 F.2d 1056, 1061 (3d Cir.1991). Once the moving party meets his or her burden, the burden shifts to the nonmovant to go beyond the mere allegations or denials of the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id.*; *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. In determining whether there is a triable dispute of material fact, the Court must construe all inferences from the underlying facts in the light most favorable to the nonmovant. *See Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976) (footnote omitted), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). However, the mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, if the evidence is "merely colorable, or is not significantly probative," summary judgment may be granted. *Id.*

## DISCUSSION

In addressing the instant summary judgment motions, the Court will first discuss the Administrative Defendants' motion.

## I. Administrative Defendants' Motion For Summary Judgment

In their motion, the Administrative Defendants raise four arguments: (1) that Plaintiff has failed to produce any evidence from which a reasonable jury could find that the Administrative Defendants violated the Eighth and Fourteenth Amendments, (2) that Plaintiff has failed to produce sufficient evidence to establish a violation of her Fifth Amendment right, (3) that the Administrative Defendants are entitled to qualified immunity, and (4) that the Administrative Defendants are entitled to summary judgment on the state law tort claims. The Court will address each of these arguments in turn.

### A. The Alleged Eighth Amendment and Fourteenth Amendment Violations

Plaintiff's Eighth and Fourteenth Amendment claims are based on allegations that the Administrative Defendants: (1) maintained deficient conditions of confinement by failing to maintain a safe environment; (2) failed to adequately train and supervise prison officials, and promulgated policies and customs that caused the alleged rape; (3) were deliberately indifferent to Plaintiff's alleged rape and her medical and psychiatric care following the alleged rape; and (4) transferred Plaintiff in retaliation for her complaints.

#### 1. Conditions of Confinement

In a conditions of confinement case, an analysis of whether a prison official violated the Eighth Amendment must begin with the Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In order to establish an Eighth Amendment violation by a prison official, two requirements must be met. First, the alleged deprivation must be objectively "sufficiently serious." *Id.* at 833–35, 114 S.Ct. at 1977 (citations omitted). Thus, where the alleged violations can be described as a failure to prevent harm, the inmate must show that his or her conditions of incarceration posed a "substantial risk of serious

harm." *Id.* Second, the prison official's state of mind must be one of "deliberate indifference" to the inmate's health or safety. *Id.* As defined in *Farmer,* deliberate indifference requires that the official know of and disregard an excessive risk to the inmate's health and safety. In other words, the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id.* at 837, 114 S.Ct. at 1979.

In *Farmer,* the Supreme Court concluded that summary judgment was inappropriately granted where the district court relied solely on the fact that the inmate "never expressed any concern for his safety to any of [respondents]." *Id.* at 848, 114 S.Ct. at 1984. The Court further concluded that an inmate's failure to notify prison officials of a risk of harm was not dispositive, particularly where the petitioner pointed to a number of statements by prison officials in which the officials evidenced a specific awareness that petitioner would suffer "sexual pressure" and "could pose a significant threat to internal security and to plaintiff in particular," because he was a transsexual. *Id.* at 1984–85.

■ Unlike the plaintiff in *Farmer,* Plaintiff in this case has failed to set forth additional facts sufficient for a reasonable jury to conclude that the Plaintiff's conditions of confinement posed a substantial risk of serious harm and that the Administrative Defendants acted with deliberate indifference to Plaintiff's health and safety.[3] Plaintiff's brief is replete with rumors and innuendos of sexual impropriety between inmates and prison guards designed to illustrate that the Administrative Defendants were aware of a risk of sexual assault to Plaintiff; however, these allegations are insufficient to establish that the Administrative Defendants were aware of a risk of harm to Plaintiff.

First, nearly all of the incidents alleged by Plaintiff arose *after* Plaintiff's alleged incident. As such, they cannot establish that the Administrative Defendants knew of and dis-

regarded a risk to Plaintiff, and are therefore, irrelevant to Plaintiff's claims.

Second, of the instances Plaintiff recounts which occurred prior to her claims, one took place at a different institution, and the other was unsubstantiated by the inmate involved. While the Administrative Defendants admit that two incidents of sexual harassment or misconduct occurred in the ten years prior to Plaintiff's alleged incident, disciplinary action was taken against the offending officer. (Def. Reply Br. at 10). Therefore, the Court concludes that the Administrative Defendants cannot be said to have displayed a "deliberate indifference" to a "substantial risk" of serious harm to Plaintiff, and such evidence is insufficient to show knowledge of a serious risk of harm to Plaintiff. Moreover, the Administrative Defendants assert, and Plaintiff does not contest, that Plaintiff's claim of rape is the first rape claim brought to the Administrative Defendants' attention.

■ Lastly, while the Plaintiff has submitted an affidavit of Correctional Officer Davies discussing rumors about additional incidents (D.I. 107), the affidavit is not based on personal knowledge and thus, does not meet the requirement of Rule 56(e).

After a review of Plaintiff's evidence, the Court concludes that Plaintiff's evidence is merely colorable and not sufficiently probative to withstand summary judgment. Therefore, the Court concludes that the Administrative Defendants are entitled to summary judgment on the issue of unconstitutional conditions of confinement.

2. Failure to Train and Supervise and Deficient Policies and Customs

■ In determining whether to hold a supervisory official liable, the Court of Appeals for the Third Circuit adheres to a two part standard. First, the plaintiff must identify with particularity what the supervisory officials failed to do that demonstrates deliberate indifference. Second, the plaintiff must demonstrate a close causal link between the alleged failure and the alleged injury. *Sam-*

---

3. Though not dispositive, the Court notes that, like the plaintiff in *Farmer,* Plaintiff in this case also failed to give the Administrative Defendants any advance notice of a risk of harm. This fact, in combination with the lack of other sufficient evidence to support her claim, distinguishes Plaintiff in this case from the plaintiff in *Farmer.*

*ple v. Diecks,* 885 F.2d 1099, 1118 (3d Cir. 1989); *House v. New Castle County,* 824 F.Supp. 477, 483 (D.Del.1993).

■ Without the support of an expert opinion, Plaintiff makes conclusory allegations that correctional officers are not adequately trained, and this failure to train and failure to discipline correctional officers for alleged violations has a "policy making" effect. To support these allegations, Plaintiff relies on "snippets" of the deposition testimony of Defendant Howard. For example, Plaintiff states that "Mr. Howard testified that the only training was during initial orientation, when the C.O.'s were advised of the 'no fraternization policy'." (Pl.'s Answer Br. at 29). However, Plaintiff neglects to point out that Defendant Howard further responded that correctional officers received "normal refresher training" in inmate supervision. (A–398). Indeed, by way of example, a review of Defendant Davis' record from the training academy reveals a total of 64 hours of additional training, including such topics as inmate supervision. (A–226).

Additionally, the policy forbidding sexual contact between correctional officers and inmates is clearly stated in a number of materials distributed to correctional officers. For example, the Department of Correction Correctional Officer Code of Conduct (the "Code") clearly states, "Any sexual contact with offenders is strictly prohibited." (A–169). In addition to this explicit statement regarding sexual conduct, the Code makes it clear that any personal or social contact with an inmate is prohibited.[4] Likewise, the Department of Correction Training Materials state that "[i]t should go without saying that staff-inmate sexual activity is completely forbidden in all institutions," and that "[n]o staff member should initiate, or allow to start, any

personal or intimate relationship with an inmate." (A–238). The importance of this policy is further stressed by the fact that the second statement appears once in the text, and a second time, in bold lettering near the center of the page. (A–238). The seriousness of these policies is emphasized by their embodiment in 11 Del.Code § 1259, which criminalizes employee and/or inmate sexual relations in a detention facility.[5] Such statutes, policies and training material suggest careful attention, rather than deliberate indifference to correctional officer training.

In addition to Plaintiff's lack of evidence of inadequate training, Plaintiff has also failed to offer an expert opinion to rebut the expert report furnished by the Administrative Defendants. According to the Administrative Defendants' expert on correctional institutions, the course of training, policy, procedures and supervision of the Delaware Department of Correction was "more than adequate." (A–391–393). While the Court is not holding that a plaintiff must produce expert testimony to substantiate failure to train and supervise claims, the Court does find that Plaintiff's lack of expert support is an additional deficiency of Plaintiff's evidence. Given Plaintiff's lack of evidence, the Court will grant summary judgment in favor of the Administrative Defendants on Plaintiff's claims regarding failure to train and supervise and deficient policies and customs.

**3. Deliberate Indifference to Plaintiff's Alleged Rape and Medical Care**

■ It is well settled that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" which is contrary to contemporary standards of decency and pro-

---

4. The Code further provides:

"Trafficking with incarcerated offenders is prohibited. No staff person shall have any personal contact with an offender, incarcerated or nonincarcerated beyond that contact necessary for the proper supervision and treatment of the offender. Examples of types of contact not appropriate include, but are not limited to ... social relationships of any type with an offender, and physical contact beyond that which is routinely required by specific job duties...."
(A–169).

5. The statute provides:

A person is guilty of sexual relations in a detention facility when, being a person in custody at a detention facility or being an employee working at a detention facility, the person engages in sexual intercourse or deviate sexual intercourse on the premises of a detention facility. It shall be no defense that such conduct was consensual. Violation of this section shall be a class G felony.
11 Del.Code § 1259.

scribed by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Such conduct also violates the Due Process Clause of the Fourteenth Amendment, because it could also result in the deprivation of life, itself. *See Bowring v. Godwin,* 551 F.2d 44, 46 (4th Cir.1977). Accordingly, deliberate indifference to a prisoner's serious medical needs states a cause of action under § 1983. *Id.* at 105, 97 S.Ct. at 291–92. However, this does not mean that every claim by a prisoner that he or she has not received adequate medical treatment states an Eighth Amendment violation. For example, mere negligence in diagnosing or treating a medical condition does not rise to the level of an Eighth Amendment violation, and thus, is not a cognizable § 1983 action. *Id.* at 106, 97 S.Ct. at 292. Therefore, "in order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.*

In applying the mandate of *Estelle v. Gamble,* the Court of Appeals for the Third Circuit concluded that the constitutional adequacy of psychiatric care and treatment for inmates should be reviewed under the same "deliberate indifference" standard that is applicable to medical care and treatment. *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 763 (3d Cir.1979). In reaching this conclusion, the Third Circuit embraced the rationale set forth in *Bowring v. Godwin,* that there is " 'no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart.' " *Id.* (citing *Bowring,* 551 F.2d at 47). As with physical care, however, courts generally refrain from second-guessing the

propriety or adequacy of a particular type of psychological or psychiatric treatment and from recognizing claims of negligence, mistake or difference of opinion.[6] *Bowring,* 551 F.2d at 48.

In this case, Plaintiff claims that the Administrative Defendants were deliberately indifferent to her medical and psychological care following the alleged rape. In particular, Plaintiff claims that she was denied adequate medical treatment, denied accesses to an outside rape counselor and inappropriately placed in "protective custody."

▮ Contrary to Plaintiff's assertions, the record indicates that Plaintiff was provided with both medical and psychological attention following the alleged rape and attempted suicide. Plaintiff was seen by Dr. Antonio Sacre on multiple occasions following the alleged rape.[7] (A–366). In addition, Plaintiff was taken to Delaware State Hospital for medical treatment and psychological evaluation following her jump off the second story tier at WCI.

▮ While inmates are entitled to medical and mental health treatment, the Eighth Amendment does not require prison officials to comply with a prisoner's demands for a particular type of treatment, particularly where the inmate's psychological condition has been addressed. *Roberts,* 1988 WL 109095 at *1. Although Plaintiff was not ultimately seen by the specific type of counselor she sought, Plaintiff was given psychiatric attention at the prison and at Delaware State Hospital.[8] Given that Plaintiff did receive psychological attention, the Court cannot say that the failure to provide a specific

---

6. See also *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir.1980) ("[A] mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment."), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Roberts v. DeRamus,* 1988 WL 109095, *1 (E.D.Pa.1988) (holding that inmate's demand for "certain type of treatment" fails to state a claim under Eighth Amendment).

7. Dr. Sacre's resume indicates that in addition to his medical degree, he has experience in the field of psychology. (A–192–201).

8. Moreover, the warden did make arrangements for a social worker in the Victim Witness Assistance Program of the Rape Response Unit of the Department of Justice to visit Plaintiff. However, the social worker had to cancel her March 20, 1995 meeting with Plaintiff due to a scheduling conflict. The social worker was advised by her supervisor not to reschedule the meeting because of the pending investigation of Plaintiff's claims. Plaintiff offers no evidence that any of the Administrative Defendants were involved in this cancellation. Indeed, that the warden tried to accommodate Plaintiff's request suggests attentiveness, not deliberate indifference.

type of treatment amounts to deliberate indifference by the Administrative Defendants.

Moreover, although both Plaintiff and the Administrative Defendants have produced different expert opinions with regard to Plaintiff's medical care, the Court finds that these opinions do not raise a genuine issue of material fact, because the experts are not in disagreement. Plaintiff's own expert could not assert that any aspect of Plaintiff's care was inadequate.[9] In fact, the only opinion that Plaintiff's expert could render to a reasonable degree of scientific certainty was that the "patient has suffered as a result of sexual contact, whether it was consensual or nonconsensual." (A–434, 435). That Plaintiff may have suffered does not indicate that the Administrative Defendants demonstrated deliberate indifference toward her mental or physical health.

■ Lastly, while Plaintiff's claim that she was inappropriately placed in "protective custody" will be addressed more fully below, insofar as this claim relates to the adequacy of her medical treatment under the Eighth Amendment, the Court concludes that Plaintiff's transfer did not amount to deliberate indifference. Rather, the Court finds Plaintiff's transfer to be indicative of the Administrative Defendants' attentiveness to Plaintiff's condition. The Administrative Defendants became aware that Plaintiff's claims put her at risk of attack by other inmates and properly acted in response to their awareness of an increased risk, by placing Plaintiff out of the general population into a more secure unit.

■ Likewise, when Plaintiff jumped off the second story tier, the Administrative Defendants appropriately brought her to a hospital and placed her on suicide watch. That Plaintiff's room contained no bed sheets, facilities or instrumentalities, indicates that the Administrative Defendants carefully sought to remove Plaintiff from all means of harm. While bed sheets may seem harmless and even essential to comfort, they may be a deadly instrument to a person who is contemplating suicide. Given the lack of evidence of deliberate indifference on the part of the Administrative Defendants, the Court concludes that the Administrative Defendants are entitled to summary judgment on Plaintiff's claims of inadequate medical treatment.

### 4. Retaliatory Transfer

■ Pursuant to the Supreme Court mandate in *Hewitt v. Helms*, this Court has frequently examined Delaware statutes and regulations governing classification within the prison system to determine whether they create a constitutionally protected interest in a prisoner's classification. *Hewitt v. Helms*, 459 U.S. 460, 470–72, 103 S.Ct. 864, 870–72, 74 L.Ed.2d 675 (1983) (finding that "unmistakenly mandatory" language in state laws may create protected liberty interest). Repeatedly, this Court has determined that the State of Delaware has created no constitutionally protected interest in a prisoner's classification.[10]

---

**9.** During his deposition, Plaintiff's expert was asked the following questions and gave the following answers:

Q: And with regard to—since you're also a physician as well as a psychiatrist, I also need to ask you . . . is it fair to say that you did not form an opinion with regard to the medical care provided by Correctional Medical Services to Ms. Carrigan in connection with the allegations in this case?

A: That is correct.

Q: . . . I need to know if you are reaching an opinion that either Dr. Sacre's care to this individual as well or any of the counseling staff or the company that he worked for at that time, Correctional Medical Services, or the Department of Correction, if you are saying that any of those people did not provided [sic] medical care to the standard that they're required to.

So if you're saying that, I need you to say that. If you're not saying that, I need you to not say that.

A: I can't say that because I have no knowledge of the extent of the care that was given to her. Of the care that I saw given to her, as far as what was provided, to my knowledge, I think all of it was appropriate. (A–431–435).

**10.** *See Blizzard v. Hastings*, 886 F.Supp. 405, 407 (D.Del.1995) (expressing grave doubts that liberty interest can be found in Delaware's statutes and regulations governing classification within the prison system, for administrative or punitive purposes); *Saunders v. Watson*, 1990 U.S.Dist. LEXIS, No. 88–519 (D.Del. Jan. 25, 1990) (Report and Recommendation) adopted, 1990 U.S.Dist. LEXIS 20248 (D.Del. June 6, 1990) (finding that Delaware statutes and regulations

Particularly, in *Shabazz v. Stephenson*, the court stated that an inmate's interest in a particular security classification or in a being assigned to a particular institution is not an interest protected by the Due Process Clause. *Shabazz*, No. 94–211–RRM, slip op. at 2 (D.Del. Mar. 15, 1995) (citing *Hewitt*, 459 U.S. at 466–68, 103 S.Ct. at 868–70). Even if the transfer works an adverse change in the conditions of confinement, as long as the conditions do not otherwise violate the U.S. Constitution, the transfer does not rise to the level of a constitutional claim. *Id.* (citing *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538–39, 49 L.Ed.2d 451 (1976)). In this case, Plaintiff admits she was transferred into protective custody in response to an increased risk of harm from other inmates. (A–360). While Plaintiff's transfer changed her conditions, the Court concludes that these changes did not rise to the level of a constitutional claim. However, because *Shabazz* was decided before the Supreme Court modified its approach to Due Process claims, the Court will examine Plaintiff's claim in light of the new standard to determine whether it has any impact on her claims.

In *Sandin v. Conner*, the United States Supreme Court engaged in a comprehensive analysis of its approach to Due Process Claims. 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Under the *Hewitt* approach, courts were required to focus on the language of particular regulations, rather than on the nature of the deprivation in

issue. As a result, the Supreme Court noted that the *Hewitt* approach has resulted in two undesirable effects. *Id.* at ——, 115 S.Ct. at 2299. First, states have become reluctant to codify prison management procedures to help guide prison personnel. *Id.* Second, the federal courts have become entangled with the day-to-day management of prisons, which has squandered judicial resources and provided little benefit. *Id.* In an effort to overcome the debilitating effects of *Hewitt*, the revised analysis for Due Process claims is meant to encourage courts to look beyond statutory language to the substantive nature of the allegedly deprived interest. The approach taken in *Sandin* requires courts to determine whether the interest in issue is an "atypical, significant deprivation in which a state might conceivably create a liberty interest." *Id.* at ——, ——, 115 S.Ct. at 2293, 2302.

 Applying the *Sandin* approach to this case, however, does not alter the Court's determination that Plaintiff has failed to allege a constitutionally protected interest. While Plaintiff's transfer into protective custody may have had some disadvantages, it also gave Plaintiff the significant advantage of safety and protection. As such, the Court concludes that Plaintiff's transfer did not work an "atypical significant deprivation." Therefore, the Court will grant summary judgment in favor of the Administrative Defendants on those claims relating to improper or retaliatory transfer.[11]

governing classification determinations create no liberty interest in prisoner's classification); *Brown v. Cunningham*, 730 F.Supp. 612, 614–15 (D.Del.1990) (finding that Delaware statutes and regulations do not create an immutable right to particular classification, rather they vest discretion in the Department of Correction to determine an inmates classification).

11. The allegations in Plaintiff's Complaint relating to retaliatory transfer expressly pertain to Plaintiff's Eighth and Fourteenth Amendment rights. Plaintiff's Complaint does not even mention a claim under the First Amendment. In her Answering Brief to the Administrative Defendants' Motion For Summary Judgment, Plaintiff, for the first time, raises a First Amendment claim based on retaliation and a denial of access to the courts. However, even if the Court were to allow Plaintiff to amend her Complaint at this late date to include a First Amendment claim,

Plaintiff's claim would not survive summary judgment.

To prevail on a claim of retaliation, a plaintiff must demonstrate by a preponderance of the evidence that: (1) he or she was retaliated against for exercising his or her constitutional rights and (2) that the retaliatory action does not advance legitimate penological goals. *Blizzard v. Hastings*, 886 F.Supp. at 409 (adopting *Barnett v. Centoni*, 31 F.3d 813, 815–16 (9th Cir.1994) (per curiam)). Here, Plaintiff claims that the Internal Affairs investigation, the failure to provide her with a rape counselor and her transfer to protective custody were aimed at retaliating against her and denying her access to the courts.

However, Plaintiff has not offered sufficient evidence to show that the alleged retaliatory actions did not advance legitimate goals of the institution. To the contrary, the Internal Affairs Investigation was necessary to assist Plaintiff in

**B.** *Qualified Immunity*

**[17, 18]** The doctrine of qualified immunity is a judicial construction aimed at balancing two competing policies: the vindication of constitutional rights by the aggrieved and the preservation of independent decision making by public officials discharging their duty. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). The current formulation for the doctrine of qualified immunity is derived from the United States Supreme Court's decision in *Harlow v. Fitzgerald*, 457 U.S. at 817–20, 102 S.Ct. at 2738–39, and *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Under the *Harlow–Anderson* formulation, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738; *Anderson*, 483 U.S. at 638, 107 S.Ct. at 3038. Generally, courts sever this formulation into a three-part inquiry: (1) whether the allegations state a claim for a violation of any rights secured by the United States Constitution, (2) whether the rights and law at issue are clearly established and (3) whether a reasonably competent official should have known that his conduct was unlawful, in light of the clearly established law. *See Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by plaintiff is "clearly established" at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.").

▪ In *Anderson*, the Supreme Court elaborated on the "clearly established law" prong of the qualified immunity inquiry.

Recognizing that the application of this standard turns on whether the legal issue is characterized broadly or narrowly, the Supreme Court concluded that the law or right allegedly violated must have been clearly established in a more particularized, fact-specific sense. *Anderson*, 483 U.S. at 639–40, 107 S.Ct. at 3038–39 (citation omitted). As such, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* Although frequently criticized as favoring defendants, this more objective, fact specific inquiry is meant to advance the important social policies of reducing litigation costs, preventing diversion of official energy from pressing public issues, and encouraging able citizens to accept public office. *Harlow*, 457 U.S. at 814, 102 S.Ct. at 2736. Given this framework and the policies it promotes, the question of whether the law is clearly established is typically a question of law for the court. *See* Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation* 104 (3d ed. 1991).

▪ In interpreting the *Anderson* approach to the "clearly established law" prong of the qualified immunity test, the Court of Appeals for the Third Circuit elicited two principles. First, the Third Circuit rejected the most strict reading of *Anderson*, which would require near factual identity between cases. Instead, the Third Circuit adopted an approach aimed at providing more flexibility without compromising the policy considerations that prompted the *Anderson* opinion. According to the Third Circuit's more flexible approach, "some but not precise factual correspondence to precedent is necessary for the defendant to be charged with knowledge of the unlawfulness of his or her actions." *Good v. Dauphin County Soc. Serv. for Children and Youth*, 891 F.2d 1087, 1092 (3d

---

bringing her claims and to assist the institution in determining the most effective way to handle Plaintiff's claims.

As to the failure to provide Plaintiff with a rape counselor, Plaintiff's claim of retaliation presupposes that the prison staff interfered with or prevented her from obtaining counseling. This assumption is unsupported by the record. Indeed, the record indicates that the institution made arrangements for Plaintiff to see the coun-

selor, and the counselor canceled the appointment. Moreover, the institution did provide Plaintiff with psychological attention.

Lastly, there is no evidence indicating that Plaintiff's transfer did not serve a legitimate penological interest. To the contrary, the record suggests that her transfer was necessary to protect Plaintiff and prevent disturbances among the prison population, given the controversial nature of Plaintiff's allegations.

Cir.1989). Thus, previous precedent directly on point is not needed to demonstrate that the law is clearly established and that immunity should be denied. *Id.* Second, the Third Circuit concluded that "even where the officials clearly should have been aware of the governing legal principles, they are nevertheless entitled to immunity if, based on the information available to them, they could have believed their conduct would be consistent with those principles." *Id.*

While the United States Supreme Court and the circuit courts continue to provide some guidance in this area, the waters surrounding the defense of qualified immunity remain murky. Nonetheless, utilizing the principles set forth by the Supreme Court and the Court of Appeals for the Third Circuit, the Court will examine whether, as an alternate ground for the Court's decision, the Administrative Defendants are entitled to qualified immunity.

### 1. Eighth and Fourteenth Amendment Claims

As is often the case with the defense of qualified immunity, the Plaintiff in this case relies on legal generalizations which are seemingly well-rooted in an effort to persuade the Court that Plaintiff's rights and the law accompanying those rights are clearly established. To support her argument that the Administrative Defendants are not entitled to qualified immunity, Plaintiff relies on the broad legal principles espoused in such cases as *Estelle v. Gamble,* 429 U.S. at 105, 97 S.Ct. at 292 (medical care); *Colburn v. Upper Darby Township,* 838 F.2d 663 (3d Cir.1988) (personal security and medical care of pre-trial detainee), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989); *Milhouse v. Carlson,* 652 F.2d 371 (3d Cir. 1981) (access to courts) and *Alberti v. Klevenhagen,* 790 F.2d 1220 (5th Cir.1986) (assault among inmates).

■ However, whether these broad constitutional principles are clearly established is not the appropriate inquiry under the qualified immunity standard. Indeed, the Supreme Court has expressly rejected the broad approach that Plaintiff takes in this case. *See Anderson,* 483 U.S. at 639–40, 107 S.Ct. at 3038–39. As stated earlier, the

appropriate inquiry for whether the law is clearly established is whether the law is "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* Though exact factual correspondence is not required, in the sense that the precedent need not be directly on point, some factual correspondence must exist between existing precedent and a plaintiff's claims. *Good,* 891 F.2d at 1092. The cases Plaintiff cites simply do not provide the factual correspondence that the Court believes is necessary to show that the law is clearly established. None of the cases Plaintiff cites in her qualified immunity argument involve allegations of sexual assault by a prison guard, rape counseling, or the training, policies or procedures that prison officials must follow to try to avoid these incidents.

Although Plaintiff cites *Alberti* directly, for the proposition that an inmate has a constitutional right to be secure in her bodily integrity and free from attack by a prison guard, this citation is misleading. (Pl. Br. at 25). In fact, *Alberti* has nothing to do with assaults by prison guards. Rather, *Alberti* is more fairly and accurately cited for the proposition that where violence and sexual assault among inmates is prevalent at a prison, it may render conditions cruel and unusual. 790 F.2d at 1224. Because of its specific and express focus on assault among inmates, Alberti is factually dissimilar to the instant case. Thus, while cases like *Alberti* may provide guidance to prison personnel on how to regulate interaction among inmates, they are not instructive on the relationship between inmates and guards.

■ The only case Plaintiff cites with the some factual correspondence to the instant matter is *Women Prisoners of the District of Columbia Dept. of Corrections v. District of Columbia,* 93 F.3d 910 (D.C.Cir.1996). In this case, the district court found that the pattern of sexual assaults on female inmates, when coupled with the inappropriate remarks of prison employees and the invasions of the inmates' privacy, rose to the level of cruelty prohibited by the Eighth Amendment. The district court then fashioned a number of remedies to address the violations. On ap-

peal, the Court of Appeals for the District of Columbia vacated certain remedies as providing broader relief than necessary and remanded the case for a determination of whether other remedies were inconsistent with the Prison Litigation Reform Act. Though on point, this case was decided *after* Plaintiff's alleged incident occurred. Therefore, this case cannot negate the Administrative Defendants' entitlement to qualified immunity on Plaintiff's claims. *See Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039 (requiring that law be in existence prior to alleged conduct to be clearly established).

Lastly, the Court also recognizes that, until recently, the cross sex supervision of prison inmates only existed to a limited extent. With recent court rulings requiring prisons to allow women to supervise men and vice versa, the problems raised by cross sex supervision have only begun to emerge as an issue in the last few years. Given this scenario and the uncertain state of the case law at the time of the Administrative Defendants' alleged unlawful conduct, the Court cannot conclude that the law pertaining to Plaintiff's claims was clearly established. Therefore, the Court concludes that the Administrative Defendants are entitled to qualified immunity on Plaintiffs's Eighth and Fourteenth Amendment claims.

### 2. Fifth Amendment Claims

In Count VI of her Complaint, Plaintiff alleges that Defendants Baylor and Sines violated her Fifth Amendment rights during their investigation of Plaintiff's alleged rape. Specifically, Plaintiff alleges that Defendants Baylor and Sines threatened her with the felony charge of having sex in prison and used intimidation in an attempt to coerce her to admit that the sexual encounter was consensual. Plaintiff further contends that Defendants Bailor and Sines knew that Plaintiff could be charged with a felony and refused to permit her to have an attorney in violation of her Fifth Amendment rights. (Count VI, ¶ 61).

In response, the Administrative Defendants argue that Plaintiff has failed to establish two important requirements for a Fifth Amendment violation. First, the Administrative Defendants contend that Plaintiff has

failed to show that any of her statements were, in fact, incriminating. Second, the Administrative Defendants contend that Plaintiff has failed to establish that any of her statements were used against her in a criminal proceeding.

In *Giuffre v. Bissell,* the Court of Appeals for the Third Circuit examined the Fifth Amendment in the context of the defense of qualified immunity. 31 F.3d 1241, 1254 (3d Cir.1994). In particular, the appeals court focused on the Ninth Circuit's en banc, "ground breaking" opinion in *Cooper v. Dupnik,* 963 F.2d 1220 (9th Cir.), *cert. denied,* 506 U.S. 953, 113 S.Ct. 407, 121 L.Ed.2d 332 (1992). The majority in *Cooper* held that allegations that a plaintiff's statements were compelled, even though those statements were never used against the plaintiff in a court of law, were sufficient to state a § 1983 claim for violation of the Fifth Amendment's self-incrimination clause. *Id.* at 1242–43. While the Third Circuit did not expressly decide whether self-incriminating, compelled evidence must be admitted in a criminal case before a plaintiff can establish a Fifth Amendment violation, the Court admitted that it found this argument persuasive. However, the Third Circuit did expressly conclude that, in light of *Cooper* and the growing disagreement with *Cooper,* this area of the law is not clearly established. *Giuffre,* 31 F.3d at 1254. Because little has changed since the Third Circuit's decision in *Giuffre,* the Court must adhere to the determination that the law on which Plaintiff bases her claims is not yet clearly established. Therefore, the Court concludes that the Administrative Defendants are entitled to qualified immunity on Plaintiff's Fifth Amendment claims.

### C. State Tort Claims

In a number of Counts in Plaintiff's Complaint, Plaintiff expressly states that she is asserting a claim pursuant to the Delaware Tort Claims Act, 10 Del.Code § 4001, *et seq.* In discussing the purpose of the State Tort Claims Act ("the Act"), the Delaware Supreme Court stated that the purpose of the Act was to codify existing common law principles of sovereign immunity. *Doe v. Cates,*

499 A.2d 1175, 1180 (Del.1985). Because this section merely limits the rights of plaintiffs to file claims against public officials, it cannot be said to confer rights of compensation. Therefore, Plaintiff cannot bring a claim pursuant to this section.

To the extent that Plaintiff is alleging a claim under the general tort law of Delaware, the Court concludes that Plaintiff cannot overcome the immunity afforded to the Administrative Defendants under 10 Del.Code § 4001. Under this section, the Plaintiff has the burden of proving the absence of one or more of the following elements of immunity:

(1) The act or omission complained of arose out of and in connection with the performance of an official duty requiring a determination of policy, the interpretation or enforcement of statutes, rules or regulations, the granting or withholding of publicly created or regulated entitlement or privilege or any other official duty involving the exercise of discretion on the part of the public officer, employee or member, or anyone over whom the public officer, employee or member shall have supervisory authority;

(2) The act or omission complained of was done in good faith and in the belief that the public interest would best be served thereby; and

(3) The act or omission complained of was done without gross or wanton negligence provided that the immunity of judges, the Attorney General and Deputy Attorneys General, and members of the General Assembly shall, as to all civil claims or causes of action founded upon an act or omission arising out of the performance of an official duty, be absolute . . .

10 Del.Code § 4001.

 In this case, Plaintiff contends that the Administrative Defendants are not entitled to immunity because they acted in bad faith or with gross or wanton negligence. (Compl. ¶ 71). The Delaware Supreme Court has defined gross negligence as conduct which represents an extreme departure from the ordinary standard of care. *Browne v. Robb,* 583 A.2d 949, 953 (Del.1990), *cert. denied,* 499 U.S. 952, 111 S.Ct. 1425, 113 L.Ed.2d 477 (1991). Wanton conduct, however, is even more egregious than conduct constituting gross negligence. Under Delaware law, the definition of wanton is best stated as a "conscious indifference evidencing an 'I-don't-care attitude.'" *Morris v. Blake,* 552 A.2d 844, 847–48 (Del.Super.Ct.1988), *aff'd,* 610 A.2d 1354 (Del.1992). Though not identical, given these definitions, it is clear that the terms "gross negligence" and "wanton conduct" bear some resemblance to the "deliberate indifference" standard that permeates constitutional law. Thus, for the same reasons that the Court concluded that Plaintiff has failed to establish sufficient evidence for a reasonable jury to conclude that the Administrative Defendants were deliberately indifferent to Plaintiff, the Court also concludes that Plaintiff has offered insufficient evidence for a reasonable jury to find gross or wanton negligence. Therefore, the Court will grant summary judgment to the Administrative Defendants on Plaintiff's state tort law claims.

## II. Defendant Davis' Motion For Summary Judgment

As an initial matter, the parties agree that Counts IV–VII and IX–X of the Complaint do not state allegations against Defendant Davis. Accordingly, these Counts will be dismissed against Defendant Davis.

The remaining counts against Defendant Davis are as follows: (1) Count I, alleging a violation of Plaintiff's Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment, (2) Count II, alleging a violation of Plaintiff's Fourth and Fourteenth Amendment rights to privacy, and (3) Counts III and VIII alleging state law tort claims against Defendant Davis. The factual basis for these counts rests solely on Plaintiff's allegations that Defendant Davis engaged in unconsented sexual intercourse with Plaintiff. However, as Defendant Davis acknowledges, the issue of Plaintiff's consent to the sex act is in dispute in this case. (Def. Davis Br. at 3). Thus, summary judgment is not appropriate because a genuine issue of material fact exists. Therefore, Defendant Davis' motion for summary judgment on Counts I and II will be denied.

As to Counts III and VIII, Plaintiff's Complaint asserts claims pursuant to 10 Del.Code § 4001. As stated earlier, this section does not confer substantive rights on plaintiffs. *See Doe*, 499 A.2d at 1180. Therefore, the Court must dismiss Counts III and VIII to the extent that they rely on this section to state a substantive claim.

 To the extent that Plaintiff's Complaint can be construed as stating a claim under general tort law, the Court will deny Defendant Davis' motion for summary judgment. Whether Plaintiff consented to the sexual act creates a genuine issue of material fact. If Plaintiff can prove lack of consent at trial, then Plaintiff may be able to prove that Defendant Davis acted with gross or wanton negligence, or in bad faith. Therefore, to the extent that Counts III and VIII allege gross or wanton negligence or bad faith, Defendant Davis' summary judgment motion will be denied.

However, to the extent that Plaintiff suggests that Defendant Davis should be liable for ordinary negligence, the Court concludes that Defendant Davis is entitled to immunity. The Delaware Tort Claims Act immunizes acts that are alleged to be merely negligent.[12] Therefore, the Court will grant summary judgment in favor of Defendant Davis, insofar as the state law claims allege mere negligence.

### CONCLUSION

For the reasons discussed, the Administrative Defendants' Motion For Summary Judgment (D.I. 67) will be granted on all counts. Defendant Davis' Motion For Summary Judgment (D.I. 63) will be denied on all counts, except Counts III and VIII insofar as they state a claim for ordinary negligence. In addition, the Administrative Defendants'

Motion To Dismiss (D.I. 63) will be denied as moot.

An appropriate Order will be entered.

---

**12.** *See Carr v. Redman*, 1988 WL 44803, **2 (Del.1988) ("We affirm the decision of the Superior Court which held that Carr's claims could not be sustained under a negligence theory because 10 Del.C. § 4001 made the named defendants immune to such claims."); *Davis v. Winslow*, 1994 WL 555315, *1 (Del.Super.Ct.1994) (holding that state "[d]efendants are immune from liability for Plaintiff's ordinary negligence claims"); *Walls v. Department of Corrections*, 1989 WL 25927, *2 (Del.Super.Ct.1989) (granting immunity and dismissing claims based on ordinary negligence under 10 Del.Code § 4001), *aff'd*, 567 A.2d 424 (Del.1989).