Valerie DANIELS, et al., Plaintiffs,

v.

State of DELAWARE,
et al., Defendants.

No. Civ.A. 96–9–JJF.

United States District Court,
D. Delaware.

Sept. 29, 2000.

Martin C. Meltzer, Wilmington, DE, Gerald Williams, Williams & Cuker, Philadelphia, PA, for plaintiff.

Gregg E. Wilson, C. Drue Chichi, Department of Justice of the State of Dela-

ware, Wilmington, DE, for the administrative defendants.

Christopher J. Curtin, Erisman & Curtin, Wilmington, DE, for defendant Rudolph Hawkins.

## *MEMORANDUM OPINION*

FARNAN, District Judge.

Presently before the Court is a renewed Motion For Summary Judgment filed by Defendants Stanley Taylor, Paul Howard, Grace Martin and Robert Watson (collectively "the Administrative Defendants") (D.I.95). For the reasons set forth below the Court will grant the Administrative Defendants' Motion For Summary Judgment.

## BACKGROUND

### I. Procedural Background

On January 10, 1996, Plaintiff Valerie Daniels, an inmate incarcerated at the Women's Correctional Institute ("WCI") filed a fifteen count Complaint alleging claims based on the Violence Against Women Act, 42 U.S.C. § 1983, and state law against the State of Delaware, the Delaware Department of Correction, former Correctional Officer Rudolph Hawkins, and several administrative officials of the Delaware Department of Correction. The allegations of Plaintiff's Complaint arise in connection with an alleged rape of Plaintiff by former correctional officer Hawkins during the week of March 7, 1995. The alleged rape of Plaintiff resulted in a pregnancy. In December 1995, Plaintiff gave birth to a son, Christopher Michael Daniels.

On December 11, 1996, Plaintiff filed an Amended Complaint, and the Administrative Defendants filed an Answer. Limited discovery was conducted by both parties pursuant to several orders of the Court.

Pursuant to a stipulation dated May 27, 1997, Defendants Bailor, Sines, the State of Delaware and the Delaware Department of Correction were dismissed from this action. In addition, the stipulation dismissed (1) all claims for monetary damages against the Administrative Defendants in their official capacities and (2) Counts VI and XIV which alleged actions under state law. Pursuant to a second stipulation dated July 22, 1997, Count IX was dismissed and Count XII was amended to remain only as a federal claim asserted pursuant to 42 U.S.C. § 1983. A third stipulation was filed on September 18, 2000, dismissing Count I of the Complaint which alleged that the Administrative Defendants violated the Violence Against Women Act.

The remaining counts of Plaintiff's Complaint allege eight claims against the Administrative Defendants. Specifically, in Counts II and VIII, Plaintiff alleges that the Administrative Defendants were informed of the conduct of Defendant Hawkins and Plaintiff's resulting pregnancy and retaliated against Plaintiff by threatening her with a felony charge and permanently placing her in a higher security section of the prison. In Count X, Plaintiff alleges that the Administrative Defendants with deliberate indifference to inflict emotional distress upon Plaintiff by placing her on suicide watch. Count X also alleges that the conditions of Plaintiff's confinement amounted to inadequate mental health treatment and improper living conditions. In Count XI, Plaintiff alleges that the Administrative Defendants failed to provide Plaintiff with diagnostic services, treatment for the mentally ill, reasonable and adequate medical care, humane treatment, a caseworker, counseling, psychotherapy, and adequate privacy to Plaintiff. The remaining Counts of Plaintiff's Complaint, Counts VII, VIII, XII and XV, raise numerous allegations, including that the Administrative Defendants had notice that their employees were sexually harassing and intimidating inmates and their failure to act on this knowledge created an environment conducive to a pattern of such behavior, which amounted to a violation of their duty to provide Plaintiff with ade-

quate care and demonstrated deliberate indifference to Plaintiff's health and safety.

Motions for summary judgment were filed by the Administrative Defendants and Defendant Hawkins. Defendant Hawkins' motion was denied by Order on the merits. However, the original motion for summary judgment filed by the Administrative Defendants was denied with leave to renew so that this matter could be referred to the magistrate for mediation. The parties were unable to resolve this action before the magistrate, and the matter was referred back to the Court. Thereafter, the Administrative Defendants renewed their motion for summary judgment relying on the briefing previously filed with the Court. To date, Plaintiff has not responded to the Administrative Defendants' renewed motion, and therefore, the Court assumes that Plaintiff relies on her previously filed Responsive Brief (D.I.59). With this background in mind, the Court will turn to the underlying factual allegations which form the basis of Plaintiff's claims.

## II. Factual Background

Plaintiff's claims arise in connection with the alleged rape and resulting pregnancy of Plaintiff by former correctional officer, Rudolph Hawkins. By way of factual background, Plaintiff contends that Defendant Hawkins engaged Plaintiff in seductive conversation and that this conversation confused and intimidated Plaintiff, who has emotional problems and developmental difficulties. While in her cell, Plaintiff contends that Defendant Hawkins forced her to perform oral sex and then vaginally raped her. Plaintiff further contends that upon leaving her cell, Defendant Hawkins instructed Plaintiff not to tell anyone. During a deposition, Plaintiff testified that she did not call out for help at the time of the alleged attack, because Plaintiff was intimidated by Defendant Hawkins and afraid of retaliation.

Several weeks after the alleged rape, Plaintiff reported to the Medical Department that she was feeling ill. Subsequent medical tests confirmed that Plaintiff was pregnant. Prison officials were given an incident report about Plaintiff's pregnancy and an internal investigation commenced. Plaintiff then disclosed to prison officials that Defendant Hawkins had raped her. Plaintiff was interviewed by prison officials and records were reviewed to determine whether Defendant Hawkins worked during the shifts in question. DNA tests were also performed on Defendant Hawkins, and Defendant Hawkins was determined to be a 95.59% match with the child.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a party is entitled to summary judgment where "the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party always bears the initial responsibility of informing the Court of the basis for its motion, and identifying those portions of the materials, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party is not required to negate the nonmovant's claim, but is only required to point out the lack of evidence supporting the nonmovant's claim. *Country Floors, Inc. v. Partnership Composed of Gepner & Ford,* 930 F.2d 1056, 1061 (3d Cir.1991). Once the moving party meets his or her burden, the burden shifts to the nonmovant to go beyond the mere allegations or denials of the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id.; Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. In determining whether there is a triable dispute of material fact, the Court must construe all inferences from the underlying facts in the light most favorable to the nonmovant. *See Goodman*

*v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976) (footnote omitted), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). However, the mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, if the evidence is "merely colorable, or is not significantly probative," summary judgment may be granted. *Id.*

## DISCUSSION

By their motion, the Administrative Defendants raise two arguments: (1) the Administrative Defendants are entitled to qualified immunity on all counts of Plaintiff's Complaint; and (2) the counts related to the birth of Christopher Michael Daniels, Counts VII and XV, fail to state a claim upon which relief may be granted, because Delaware law does not recognize actions for wrongful life or wrongful birth. The Court will address each of the these arguments in turn.

## I. Whether The Administrative Defendants Are Entitled To Qualified Immunity

### A. *The Law of Qualified Immunity*

 Under the doctrine of qualified immunity, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Generally, courts approach qualified immunity utilizing a three part inquiry: (1) whether the allegations state a claim for the violation of rights secured by the United States Constitution; (2) whether the rights and laws at issue are clearly established; and (3) whether a reasonable competent official should have known that his conduct was unlawful, in light of the clearly established law. *See Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

 As the Court of Appeals for the Third Circuit has recently recognized, when a defendant claims qualified immunity in a Section 1983 action, the court's "first task is to assess whether the plaintiff's allegations are sufficient to establish the violation of a constitutional or statutory right at all." *Gruenke v. Seip*, 225 F.3d 290, 298–99 (3d Cir.2000). Once this threshold is inquiry is satisfied, then the court must determine "whether, as a legal matter, the right that the defendant's conduct allegedly violates was a clearly established one, about which a reasonable person would have known." *Id.*

In *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court elaborated on the meaning of the phrase "clearly established right." Recognizing that the application of this standard turns on whether the legal issue is characterized broadly or narrowly, the Supreme Court concluded that the right allegedly violated must be clearly established in a more particularized, fact specific sense. *Id.* at 639–640, 107 S.Ct. 3034 (citations omitted). As the Court explained:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 639, 107 S.Ct. 3034.

 In interpreting the *Anderson* approach to the "clearly established right" prong of the qualified immunity test, the Court of Appeals for the Third Circuit has

rejected a strict reading of *Anderson* which would require near factual identity between cases. Under the Third Circuit's more flexible approach, "some but not precise factual correspondence to precedent is necessary for the defendant to be charged with knowledge of the unlawfulness of his or her actions." *Good v. Dauphin County Soc. Serv. for Children & Youth,* 891 F.2d 1087, 1092 (3d Cir.1989).

 Further, the Third Circuit has concluded that "even where the officials clearly should have been aware of the governing legal principles, they are nevertheless entitled to immunity, if based on the information available to them, they could have believed their conduct would be consistent with those principles." *Id.* This inquiry necessarily requires the court to examine the defendant's conduct and determine the "objective legal reasonableness" of the defendant's actions. *Gruenke,* at 299 ("[A]n official will not be liable for allegedly unlawful conduct so long as his actions are objectively reasonable under current federal law.") As the Supreme Court and Third Circuit have observed, "all but the plainly incompetent or those who knowingly violate the law are protected by qualified immunity." *Id.* (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

With these principles in mind, the Court will address each of Plaintiff's claims.[1]

### B. *Failure To Protect Claims*

Plaintiff alleges that the Administrative Defendants violated her Eighth and Fourteenth Amendment rights by failing to protect her from Defendant Hawkins. Specifically, Plaintiff contends that (1) the Administrative Defendants were on notice that Plaintiff faced a substantial risk of harm, and (2) the Administrative Defendants were deliberately indifferent to the risk Plaintiff faced. Plaintiff further contends that the Administrative Defendants are not entitled to qualified immunity on Plaintiff's failure to protect claims, because an inmate's right to bodily integrity and her right to be free from attack are clearly established constitutional rights.

In response to Plaintiff's arguments, the Administrative Defendants do not contest that an inmate has a right to be free from sexual assault and a right to bodily integrity. However, the Administrative Defendants contend that they are entitled to qualified immunity because (1) as a threshold matter, Plaintiff's allegations do not state violations of her constitutional rights, and (2) in any event, the Administrative Defendants' conduct was not contrary to Plaintiff's constitutional rights.

 Consistent with the threshold inquiry for the application of qualified immunity, the Court must first determine whether Plaintiff's allegations are sufficient to establish a violation of a constitutional right. The constitutional rights which Plaintiff alleges were violated in her failure to protect claims are the Eighth and Fourteenth Amendments.[2] To establish an Eighth Amendment violation for failure to prevent harm, an inmate must establish that (1) the conditions of incarceration pose a substantial risk of serious

[1]. As indicated previously in discussing Plaintiff's Complaint, Plaintiff alleges multiple violations of her civil rights based upon a variety of alleged actions and omissions by the Administrative Defendants. For ease of discussion, the Court will refer to Plaintiff's claims in the same manner that Plaintiff categorizes those claims in her Responsive Brief In Opposition To The Motion Of The Administrative Defendants For Summary Judgment (D.I.59).

[2]. The Administrative Defendants contest Plaintiff's assertion that an inmate can bring a separate claim for failure to protect under the Fourteenth Amendment. According to the Administrative Defendants, a convicted inmate's only redress is under the Eighth Amendment. For purposes of the Court's qualified immunity analysis, the Court need not address the issue raised by the Administrative Defendant's challenge, because the parties acknowledge that under either the Eighth or Fourteenth Amendment, the test is substantially the same, i.e. a deliberate indifference test.

harm; and (2) the prison official's state of mind must be one of deliberate indifference to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). As defined in *Farmer*, deliberate indifference requires that the prison official know of and disregard an excessive risk to the inmate's health and safety. *Id.* at 837, 114 S.Ct. 1970. Stated another way, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id.*

█ A prison official's knowledge of a substantial risk is a question of fact, which can be proven by circumstantial evidence. *Id.* By way of example, in the context of inmate attacks by other inmates, the *Farmer* court explained the type of circumstantial evidence needed for a finding of actual knowledge on the part of a prison official as follows:

> [I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was 'long-standing, pervasive, well-documented, or expressly noted by prison officials in the past and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant official had actual knowledge of the risk.'

*Farmer*, 511 U.S. at 842–843, 114 S.Ct. 1970 (citations omitted).

█ Plaintiff contends that there is sufficient circumstantial evidence in the record to raise a genuine issue of material fact concerning the Administrative Defendants' knowledge of the risk of harm to

Plaintiff. Specifically, Plaintiff relies on the administrative investigation of a correctional officer at WCI named Michael Clendaniel and the sexual encounter between inmate Dorothy Carrigan and former correctional officer Peter Davis to argue that the Administrative Defendants were on notice of a risk of harm to Plaintiff.[3]

After reviewing the record as it relates to the circumstantial evidence offered by Plaintiff, the Court concludes, as a matter of law, that the evidence proffered by Plaintiff is insufficient to raise a genuine issue of material fact concerning the Administrative Defendant's knowledge and subsequent disregard of a substantial risk of harm to Plaintiff. With regard to the Clendaniel incident, the record indicates and Plaintiff acknowledges that the crux of the incident concerned Clendaniel's conduct in taking female inmates outside their cells after lock down without permission in violation of the prison's Cell Override Policy. (D.I. 61 at B–119–121). Although other inmates interviewed during the investigation suggested that Clendaniel was having sexual relationships with female inmates, the investigation revealed no evidence substantiating the truth of these allegations, and Plaintiff has offered no additional evidence to suggest otherwise. (D.I. 68 at C–39). As the Court held in *Carrigan*, rumors and innuendos of sexual impropriety between inmates and prison guards is insufficient as a matter of law to establish that the Administrative Defendants were aware of and deliberately disregarded a risk of harm to Plaintiff. *Carrigan v. State of Delaware*, 957 F.Supp. 1376, 1382 (D.Del.1997).

█ Moreover, the record in this case indicates that prison officials vigorously

---

**3.** For a full discussion of the incident involving inmate Carrigan and former correctional officer Peter Davis, *see Carrigan v. State of Delaware*, 957 F.Supp. 1376 (D.Del.1997) (granting Administrative Defendants' motion for summary judgment and denying former correctional officer's motion for summary judgment) and *Carrigan v. Davis*, 70 F.Supp.2d 448 (D.Del.1999) (granting plaintiff's motion for judgment as a matter of law on liability and concluding that sexual intercourse between inmate and correctional officer, whether consensual or not, is per se violation of inmate's Eighth Amendment rights).

investigated the allegations concerning Clendaniel, disciplined Clendaniel for his misconduct in taking prisoners outside of their cells after lock down and instituted stricter procedures concerning lock down. (D.I. 68 at C–34–53). In the Court's view, the Administrative Defendants' actions, including the disciplinary actions against Officer Clendaniel, were entirely reasonable given the nature of the alleged offense by Clendaniel and the lack of evidence supporting the allegations of sexual improprieties against Clendaniel. As the *Farmer* court noted, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844, 114 S.Ct. 1970. Thus, even if the Administrative Defendants knew of a risk to Plaintiff as a result of the Clendaniel incident, their reasonable response to the incident is sufficient to preclude liability. *Id.; see also Hamilton v. Leavy*, 117 F.3d 742, 747 (3d Cir.1997) ("If a prison official responds reasonably to a risk to an inmate's safety, he or she cannot be found to have acted with a sufficiently culpable state of mind."). Given the disciplinary and remedial action taken by the prison concerning the Clendaniel incident and the lack of factual evidence substantiating Plaintiff's allegations about the alleged sexual nature of the Clendaniel incident, the Court concludes that the Clendaniel incident is insufficient as a matter of law to support a finding that the Administrative Defendants were deliberately indifferent to Plaintiff's health and safety.

 As for the Carrigan–Davis incident, the record indicates that inmate Carrigan reported this incident to Deputy Warden Grace Martin on March 9, 1995 or March 10, 1995. Plaintiff admits that the exact date of her encounter with Defendant Hawkins is not known; but medical evidence suggests that it was likely to have occurred sometime in early March 1995. Given these time frames, Plaintiff's alleged rape may have been either before the Carrigan incident even occurred or nearly contemporaneously with the incident, such that the Administrative Defendants would have still been in the investigative stages of the Carrigan incident. Moreover, upon learning of the Carrigan incident, the Administrative Defendants immediately began an investigation and suspended Davis from working at WCI pending the outcome of the investigation.[4] Then, upon confirming the truth of inmate Carrigan's allegations against Davis, the Administrative Defendants took immediate action in reporting Davis to the Delaware State Police for a criminal investigation. Like their response to the Clendaniel incident, the Court finds that the Administrative Defendants acted reasonably in response to the Carrigan incident. Thus, even if the Carrigan incident was sufficient to make the Administrative Defendants aware of a risk of harm to Plaintiff, the reasonableness of the Administrative Defendants' response to the risk is sufficient to preclude their liability under the Eighth and Fourteenth Amendments. *Farmer*, 511 U.S. at 844, 845, 114 S.Ct. 1970; *Hamilton*, 117 F.3d at 748. Given the lack of clarity concerning the date of Plaintiff's alleged rape, its temporal proximity to the Carrigan incident and the reasonableness of the Administrative Defendants' response to the Carrigan incident, the Court concludes that the Carrigan incident is insufficient as a matter of law to support a finding that the Administrative Defendants knew of and deliberately disregarded a substantial risk of harm to Plaintiff.

In discussing the circumstantial evidence in this case, Plaintiff places great weight on the Third Circuit's decision in *Hamilton v. Leavy*, 117 F.3d 742 (3d Cir. 1997), a case involving an inmate who was

---

4. Following his arrest on criminal charges, Davis resigned voluntarily from his position as a correctional officer.

attacked by another inmate at Gander Hill prison in Wilmington, Delaware. In *Hamilton*, the Third Circuit reversed the district court's grant of summary judgment in favor of prison officials and concluded that the plaintiff had presented sufficient evidence for a fact finder to conclude that prison officials were deliberately indifferent to a substantial risk of harm to the plaintiff. *Id.* at 744. In the Court's view, however, the circumstances in *Hamilton* were quite different from the circumstances in this case.

In *Hamilton*, there was a long-standing history of violence, assaults and threats against the plaintiff. *Id.* at 744–745. The plaintiff had been transferred out of the State of Delaware twice and placed in protective custody numerous times. The Multi–Disciplinary Team at Gander Hill prison unanimously recommended that the plaintiff be placed in protective custody, but this recommendation was not implemented by prison officials. The Delaware Department of Corrections Central Institutional Classification Committee, chaired by Frances Lewis, determined that "no action" should be taken with respect to the plaintiff, even though Ms. Lewis was aware of the history of attacks on the plaintiff and had herself approved his transfer to protective custody on several occasions. *Id.* at 745. Concluding that this evidence was essentially identical to the type of evidence hypothesized by the *Farmer* court, the Third Circuit concluded that the plaintiff presented sufficient evidence to demonstrate that Lewis consciously disregarded an obvious and substantial risk of harm to the plaintiff. *Id.* at 748.

Unlike the circumstances in *Hamilton*, in this case, there is no long-standing history of violence or threats of harm to Plaintiff by any correctional officers. Moreover, there is no record of misconduct by Defendant Hawkins from which the Administrative Defendants could be said to

have known or anticipated that he would pose a risk to Plaintiff.[5] To the contrary, Defendant Hawkins personnel file indicates that over the course of his employment with the Department of Corrections, his performance was rated satisfactory or better. Defendant Hawkins had no disciplinary record and had received two commendations for perfect attendance in two separate years. (D.I. 51 at A–125–139, A–140–141). Accordingly, the Court concludes that Plaintiff has not presented sufficient evidence to support a finding that the Administrative Defendants were deliberately indifferent to a substantial risk of harm to Plaintiff.

In addition to the *Hamilton* case, Plaintiff relies on *Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir.1993) for the proposition that "intentional sexual touching or other physical contact with a convicted prisoner by a prison employee such as correctional officers may violate the Constitution." (D.I. 59 at 35). The Court does not disagree with this proposition. However, the *Hovater* case is instructive on more than the "clearly established right" prong of the qualified immunity analysis.

In *Hovater*, the Court of Appeals for the Tenth Circuit reversed the district court's denial of qualified immunity to a prison official, Sheriff Hill. In so doing, the court expressly addressed a contention raised implicitly throughout Plaintiff's brief in this case—specifically, the suggestion that the Administrative Defendants were on notice of a risk of harm to Plaintiff because of their practice of allowing male correctional officers to supervise female inmates. Recognizing the tension between an inmate's right to privacy and a guard's right not be discriminated against in employment, the Tenth Circuit in *Hovater* refused to conclude that Sheriff Hill "disregarded an obvious risk to the safety of female inmates by allowing a single male guard to

---

5. To the extent that Plaintiff relies on the Clendaniel and Carrigan incident to establish a history of violence, the Court rejects Plain-

tiff's argument for the reasons the Court discussed previously in the context of addressing these specific instances of misconduct.

have custody of a female inmate absent any indication that the guard would assault her." 1 F.3d at 1066. Holding that Sheriff Hill was entitled to qualified immunity because the plaintiff could not establish a constitutional violation, the court further observed:

> Sheriff Hill had no knowledge that Mr. Robinson was a threat to the female inmates. Any known harm could stem only from the mere fact of Mr. Robinson's gender. To find a harm present in these circumstances would, in effect, require the conclusion that every male guard is a risk to the bodily integrity of a female inmate whenever the two are left alone. There is absolutely no evidence in this record to support that conclusion. A constitutional violation may not be established by a reliance upon unsupported assumptions. Had Sheriff Hill possessed information that Mr. Robinson as an individual posed a threat to the safety of female inmates, our decision would be different.

*Id.* at 1068.

■ As in *Hovater*, Plaintiff in this case has not presented any evidence, other than Defendant Hawkins gender, to establish that the Administrative Defendants knew that Defendant Hawkins posed a threat to Plaintiff's health and safety. Further, the Administrative Defendants cannot be held liable for Defendant Hawkins conduct, absent actual knowledge of and acquiescence in the conduct, because there is no respondeat superior liability under 42 U.S.C. § 1983. *See Monell v. Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (citing *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)); *Baker v. Monroe Township,* 50 F.3d 1186, 1194 (3d Cir.1995) (requiring "actual knowledge and acquiescence" to impose supervisory liability). Plaintiff has presented no evidence that the Administrative Defendants knew of or acquiesced in Defendant Hawkins conduct. Indeed, the unrebutted record indicates that it was not until three months later, in June 1995, that the Administrative Defendants learned of Plaintiff's claim against Defendant Hawkins. Thus, the Court concludes that Plaintiff has failed to offer sufficient evidence to support a finding of liability on her Eighth and Fourteenth Amendment claims against the Administrative Defendants. Because Plaintiff cannot establish that the Administrative Defendants violated Plaintiff's constitutional rights, the Court concludes that the Administrative Defendants are entitled to qualified immunity on Plaintiff's failure to protect claims.

### C. Failure To Train And Supervise Claims

Based on the opinions of her expert witness, Plaintiff contends that the Administrative Defendants have failed to train and supervise correctional officers. To this effect, Plaintiff contends that the Administrative Defendants failed to appropriately train correctional officers, failed to promulgate effective policies and procedures, and failed to supervise employees by ensuring that they adhered to the prison's policies. Consistent with the analysis for qualified immunity, the Court must first address whether Plaintiff's allegations are sufficient to establish a constitutional violation.

■ To establish a Section 1983 claim for failure to train and supervise employees, a plaintiff must (1) identify with particularity what the supervisory officials failed to do that demonstrates deliberate indifference and (2) demonstrate a close causal link between the alleged failure and the alleged injury. *Sample v. Diecks,* 885 F.2d 1099, 1118 (3d Cir.1989). As the Supreme Court has stated, the "inadequacy of ... training may serve as the basis for Section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the [official] ... come[s] into contact." *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Deliberate indiffer-

ence may be established where the need for more or different training is obvious, such as where the failure to train has caused a pattern of violations. *See e.g. Berg v. County of Allegheny*, 219 F.3d 261 (3d Cir.2000) (discussing failure to train in the context of municipality liability). With these principles in mind, the Court will examine the allegations comprising Plaintiff's failure to train and supervise claims.

■ With regard to Plaintiff's contention that the Administrative Defendants failed to adequately train correctional officers, Plaintiff contends that Defendant Hawkins did not receive any specific training before being assigned to WCI and Defendant Hawkins was not trained in cross-gender supervision. Plaintiff's expert witness raises the Standards for Adult Correctional Institutions promulgated by the America Correctional Association ("ACA") in support of her failure to train argument.

■ It is well-established that the standards promulgated by national groups like the ACA do not necessarily equate with constitutional standards. As the Supreme Court has recognized, "the recommendations of these various groups may be instructive in certain cases, [but] they simply do not establish the constitutional minima; rather they establish goals recommended by the organization in question." *Bell v. Wolfish*, 441 U.S. 520, 543–544 n. 27, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). However, even under the ACA standards, the record indicates that Defendant Hawkins received a sufficient number of training hours to satisfy the ACA minimum number of hours for an officer with his years of experience. (D.I. 51 at A–142–147). That the correctional officers' training programs were sufficient under national standards is further evidenced by the Award of Excellence for Outstanding Correctional Training System which was presented to the Delaware Department of Correction by the International Association of Correctional Training Personnel in October 1994. (D.I. 68 at C–33, 99).

■ With regard to cross-gender supervision training in particular, Plaintiff has not presented any evidence that such training is a constitutional minimum. Indeed, the ACA standards upon which Plaintiff relies for much of her lack of training argument do not include cross-gender supervision as a required training topic. (D.I. 68 at C–28a). Further, contrary to Plaintiff's assertion that Defendant Hawkins was not trained in cross-gender supervision, the record indicates that Defendant Hawkins received training in Cultural Awareness which included training in sexual harassment, Professional Ethics, Inmate Supervision and Inmate Treatment. (D.I. 51 at A–163–228). In addition, Defendant Hawkins also received training regarding the correctional department's Code of Conduct, which expressly prohibits any sexual contact between inmates and guards. (D.I. 51 at A–150–162). Defendant Hawkins acknowledged his receipt of the Code and his responsibility for acting in accordance with its mandates. (D.I. 51 at A–229). Given the record evidence on training, the Court concludes that Plaintiff cannot establish that the Administrative Defendants were deliberately indifferent to the rights of the individuals with whom the correctional officers would come in contact.

■ As for Plaintiff's allegation that the Administrative Defendants failed to promulgate effective policies and ensure their employees' compliance with those policies, the Court likewise concludes that Plaintiff's evidence is insufficient to preclude summary judgment on the question of deliberate indifference. The record indicates that the Administrative Defendants promulgated express and clear policies forbidding sexual contact between correctional officers and inmates. For example, the department's Code of Conduct clearly and succinctly provides, "Any sexual contact with offenders is strictly prohibited." (D.I. 51 at A–150–162). In addition to this explicit statement prohibiting

sexual contact, the Code goes one step further by prohibiting any personal or social contact between inmates and guards. (D.I. 51 at A–150–162). Consistent with the policies embodied in the Code of Conduct, the Administrative Defendants also promulgated separate and discrete policies prohibiting sexual relations in the prisons and providing for grievance and redress procedures to report inappropriate conduct by correctional officers. (D.I. 51 at A–148–149, D.I. 68 at C–1–15). Further, these policies are reinforced by the Department of Correction Training Materials, as well as by 11 Del.C. § 1259, which criminalizes employee and/or inmate sexual relations in a detention facility.[6] Given the record evidence concerning the quality and quantity of the Administrative Defendants' training and policies, the Court concludes that Plaintiff's allegations are insufficient to support a finding that the Administrative Defendants acted in a manner evidencing deliberate indifference.

■ As with her previous argument concerning her failure to protect claim, Plaintiff places a great deal of emphasis on the Clendaniel incident to establish that the Administrative Defendants did not appropriately supervise employees so as to ensure their compliance with the prison's policies. Though not articulated expressly by Plaintiff, it appears that Plaintiff's argument is that the Administrative Defendants had a policy or custom of laxness or inaction with respect to its Cell Override Policy that had the effect of condoning or allowing correctional officers to engage in inappropriate sexual conduct with inmates. (D.I. 59 at 14–15, 37–38). The Court disagrees with Plaintiff. First, the record indicates that upon learning of Clendaniel's failure to follow the Cell Override Policy, the administrative Defendants vigorously investigated Clendaniel. (D.I. 68 at C–34–53). Clendaniel admitted to having had inmates out of their cells in violation of the prison's policies, and the Administrative Defendants disciplined Clendaniel for his violation. The Administrative Defendants also vigorously investigated the allegations that Clendaniel was having sexual relationships with inmates; however, their investigation revealed no evidence proving the truth of these allegations. (D.I. 68 at C–34–39). Second, to establish deliberate indifference in the failure to train and supervise context, courts have generally required a pattern of violations. *See e.g. Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (discussing failure to train in context of municipality liability); *Berg v. County of Allegheny,* 219 F.3d 261, 275–276 (3d Cir.2000) (same). The Clendaniel incident is a single incident, which in the Court' view is insufficient to establish a pattern of violations. Given the policies and training materials promulgated by the Administrative Defendants, the lack of evidence concerning a pattern of violations of these policies by employees, and the Administrative Defendants' response to the Clendaniel incident, the Court concludes that Plaintiff cannot establish that the Administrative Defendants were deliberately indifferent with regard to the training and supervision of correctional officers and the promulgation of effective policies.[7] Because Plaintiff

---

**6.** The statute provides:

A person is guilty of sexual relations in a detention facility when, being a person in custody at a detention facility or being an employee working at a detention facility, the person engages in sexual intercourse or deviate sexual intercourse on the premises of a detention facility. It shall be no defense that such conduct was consensual. Violation of this section shall be a class G felony.

11 Del.Code § 1259.

**7.** In the alternative, even if Plaintiff could establish deliberate indifference, the Court concludes that Plaintiff cannot establish a causal link between the alleged failure to train and Plaintiff's injury. Plaintiff alleges that Defendant Hawkins did not just have sexual relations with her, but that Defendant Hawkins raped her with criminal intent. Plaintiff has not alleged what policies, procedures or training the Administrative Defendants could have given correctional officers to prevent such an intentional crime of violence.

cannot as a matter of law establish the violation of a constitutional right, the Court concludes that the Administrative Defendants are entitled to qualified immunity on Plaintiff's failure to train and supervise claim.

### D. *Post–Rape Trauma and Medical Care Claim*

Plaintiff's claim concerning her medical care focuses primarily on the psychological care and treatment by the prison. Specifically, Plaintiff contends that the Administrative Defendants were deliberately indifferent to her psychological care following the alleged rape. Plaintiff submits an expert report from Susan Fiester, M.D. noting that Plaintiff received psychiatric treatment and medications, but opining that her treatment and medications were inadequate. (D.I. 59 at 39; D.I. 61 at B–16). According to Plaintiff, this expert report is sufficient to create a genuine issue of material fact as to whether the Administrative Defendants were deliberately indifferent to Plaintiff's serious medical needs.

In response to Plaintiff's arguments, the Administrative Defendants offer the report of their own expert, Dr. Antonio Sacre, M.D., opining that the treatment Plaintiff received for her psychological complaints was adequate and appropriate. In addition, the Administrative Defendants contend that they cannot be held responsible for Plaintiff's medical and psychological care, because they were in no way directly involved with the care administered to Plaintiff. To this effect, the Administrative Defendants point out that Correctional Medical Systems provided Plaintiff with her psychological care. Because respondeat superior liability is precluded under Section 1983, the Administrative Defendants contend that they cannot be held liable for the actions or omissions of Correctional Medical Systems. Consistent with the framework for analyzing qualified immunity claims, the Court must first determine whether Plaintiff's allegations are sufficient to establish the violation of a constitutional right.

#### 1. Deliberate indifference to serious medical needs

It is well settled that a prison official's deliberate indifference to the serious medical needs of an inmate may violate the inmate's Eighth and Fourteenth Amendment rights. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); *Bowring v. Godwin,* 551 F.2d 44, 46 (4th Cir.1977). However, not every claim of inadequate medical treatment by an inmate is sufficient to rise to the level of a constitutional violation. In order to establish a constitutional claim for the denial of adequate medical treatment "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Deliberate indifference is demonstrated by "the deliberate deprivation of adequate medical care or the defendant's action or failure to act despite his or her knowledge of a substantial risk of serious harm." *Pew v. Connie,* 1997 WL 717046, *4 (E.D.Pa. Nov.14, 1997). Mere negligence

Indeed, Plaintiff offers no evidence to establish that even if additional training or policies would have been implemented, the criminal act by Defendant Hawkins would have been averted. *See e.g. Abdeljalil v. City of Fort Worth,* 55 F.Supp.2d 614, 620 (N.D.Tex.1999) (rejecting failure to train and supervise claim where no evidence existed that additional training would have prevented employee from intentionally stealing property). Defendant Hawkins testified that he was fully aware that sexual relations with inmates, whether consensual or not, was prohibited and that he could be criminally charged for engaging in such conduct, yet Defendant Hawkins allegedly engaged in the very conduct which he knew was against prison policies and state law. (D.I. 68 at C–65). Because Plaintiff cannot demonstrate a causal link between the alleged failure to train and her injuries, the Court concludes that Plaintiff cannot establish the violation of a constitutional right based on the failure to train and supervise.

in diagnosing or treating a medical complaint does not state a claim of deliberate indifference to a prisoner's medical needs. *Id.* (citations omitted). Rather, deliberate indifference requires a showing that the official acted willfully or with a subjective recklessness. *Id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

■■■ With regard to the adequacy of psychiatric care and treatment of inmates, the Third Circuit has recognized that there is " 'no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart.' " *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 763 (3d Cir.1979) (citing *Bowring,* 551 F.2d at 47). Accordingly, the Third Circuit has concluded that the constitutional adequacy of psychiatric care and treatment for inmates should be reviewed under the same "deliberate indifference" standard that is applicable to medical care and treatment. Thus, claims of negligence, mistake or difference of opinion with respect to the propriety or adequacy of psychological or psychiatric care and treatment do not rise to the level of a constitutional violation. *Bowring,* 551 F.2d at 48.

■■■ Plaintiff offers the expert report of Dr. Susan Fiester to support her claims that Plaintiff's care and treatment was inadequate. Plaintiff pits her expert report against the report of Dr. Sacre to argue that the reports raise a genuine issue of material fact concerning the adequacy of Plaintiff's care and treatment. The Court disagrees with Plaintiff's argument.

First, the expert reports of Plaintiff and Defendant are not inconsistent to the extent that both Plaintiff's expert and Defendant's expert acknowledge that Plaintiff received medical and psychiatric treatment and evaluation, including antidepressant medications. Courts in this circuit have repeatedly refused to hold supervisory officials who are not physicians liable where, as here, the plaintiff has received medical

and/or psychiatric treatment. *See e.g. Durmer v. O'Carroll,* 991 F.2d 64, 68 (3d Cir.1993) (holding that warden and state commissioner for corrections was not deliberately indifferent for failing to respond directly to prisoner's medical complaints where prisoner was receiving treatment from prison doctor).

Second, to the extent that Plaintiff and Defendant's experts disagree on the care and treatment Plaintiff received, the Court concludes that this disagreement is insufficient as a matter of law to preclude summary judgment. For example, Plaintiff and her expert point out that Plaintiff was not treated by a rape counselor and that "no efforts of pharmacotherapy with antidepressant medication were being attempted." However, courts in this circuit have repeatedly recognized that deliberate indifference cannot be established where an inmate receives treatment, even if that treatment is not exactly the type of treatment the inmate requests. *Norris v. Frame,* 585 F.2d 1183, 1186 (3d Cir.1978); *Calhoun v. Horn,* 1997 WL 672629, *4 (E.D.Pa. Oct.29, 1997); *Farley v. Doe,* 840 F.Supp. 356 (E.D.Pa.1993) (holding that plaintiff did not establish constitutional violation where plaintiff received extensive medical treatment, but treatment was not entirely to his liking). Further, to the extent that Plaintiff's expert and Defendant's expert disagree on the adequacy of Plaintiff's care and treatment, their disagreement is no more than a difference of medical opinion over appropriate treatment methods which, in the Court's view, is insufficient to create a genuine issue of material fact. As this Court stated in *Carrigan,* "courts generally refrain from second-guessing the propriety or adequacy of a particular type of psychological or psychiatric treatment and from recognizing claims of negligence, mistake or difference of opinion." 957 F.Supp. at 1384. Because the factual dispute raised by the experts in this case is merely a difference of medical opinion and because the record indicates that Plaintiff received treatment for her psychological condition, the Court

concludes that Plaintiff's allegations are insufficient to support a finding that the Administrative Defendants were deliberately indifferent to Plaintiff's psychological needs. Because Plaintiff has failed, as a threshold matter, to establish a constitutional violation, the Court concludes that the Administrative Defendants are entitled to qualified immunity on Plaintiff's claim of inadequate medical treatment.

### 2. Respondeat superior liability

In addition to the lack of evidence establishing deliberate indifference on the part of the Administrative Defendants, Plaintiff has also failed to prove that the Administrative Defendants were directly involved with the medical care administered to Plaintiff. It is well-established that the doctrine of respondeat superior is not an acceptable basis for liability under Section 1983. *See e.g. Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Rather, a Section 1983 plaintiff must establish that supervisory officials participated in or had personal knowledge of and acquiesced in the actions which are alleged to have constituted a constitutional deprivation. *Miller v. Hoffman*, 1999 WL 415397, *11 (E.D.Pa. June 22, 1999). In this case, Plaintiff has offered no evidence that the Administrative Defendants were directly involved with the medical care administered to Plaintiff. Plaintiff also offers no evidence that the Administrative Defendants prevented her from receiving medical care. Indeed, Plaintiff's expert report does not even mention the Administrative Defendants. Where, as here, a plaintiff is already receiving medical treatment, supervisory officials cannot be held liable for failing to directly respond to the plaintiff's medical complaints. *Freed v. Horn*, 1995 WL 710529 (E.D.Pa. Dec.1, 1995) (holding that supervisory officials were not liable, because they were not personally involved in treating plaintiff's medical condition or in the decision to remove him from particular type of medication). Given the evidence that Plaintiff received medical and psychological treatment and the lack of evidence produced by Plaintiff concerning any role by the Administrative Defendants in failing to provide Plaintiff adequate care, the Court concludes that Plaintiff cannot establish, as a matter of law, that the Administrative Defendants were deliberately indifferent to Plaintiff's medical and psychological needs. Because Plaintiff has not established a violation of a constitutional right, the Court concludes that the Administrative Defendants are entitled to qualified immunity on Plaintiff's claims.

### E. Retaliation Claims

Plaintiff contends that the Administrative Defendants committed retaliation by various administrative and investigatory pressures. Specifically, Plaintiff contends that the Administrative Defendants instructed prison employees, Corporal Victoria DuPree and Chaplain Bernita Earle, to "befriend" or "counsel" Plaintiff so as to secure damaging admissions from her about the incident and to silence her. (D.I. 59 at 40–41). The Court must again determine, as a threshold matter, whether Plaintiff's retaliation claim is sufficient to establish the violation of a constitutional right.

Retaliation against a prisoner by prison officials for registering a complaint or asserting his or her rights may state a claim under Section 1983. To prevail on a claim of retaliation, the plaintiff must show that (1) he or she was retaliated against for exercising her constitutional rights and (2) the alleged retaliatory action did not advance legitimate penological goals. *Blizzard v. Hastings*, 886 F.Supp. 405, 407 (D.Del.1995), *aff'd*, No. 95–7227 (3d Cir. May 28, 1996).

After reviewing the record as it relates to Plaintiff's claims of retaliation, the Court concludes that Plaintiff has

failed to establish a Section 1983 claim for retaliation. With regard to Plaintiff's contact with correctional officer DuPree, the record indicates that upon learning of Plaintiff's pregnancy, Warden Howard asked Corporal DuPree to speak with Plaintiff in order to ascertain the facts of her pregnancy. (D.I. 51 at A–270–271). During a deposition, Plaintiff admitted that her conversation with Corporal DuPree was the first time she spoke out about the circumstances of her pregnancy and the first time that she identified the father of her child. (D.I. 68 at C–63a–63b). Because Plaintiff had not spoken about her pregnancy prior to her conversation with Corporal DuPree, Plaintiff's conversation with Corporal DuPree cannot as a matter of law be a retaliatory action for reporting her pregnancy.

■ As for her conversations with Chaplain Earle, the uncontroverted evidence indicates that Plaintiff knew Chaplain Earle in the community and voluntarily sought her out and initiated the conversation. (D.I. 68 at C–62–63; C–75–86). Accordingly, Plaintiff's conversation with Chaplain Earle is insufficient, as a matter of law, to constitute a retaliatory action by the Administrative Defendants.

■ To the extent that Plaintiff suggests that it was retaliatory for the Administrative Defendants to use the information Plaintiff provided to Corporal DuPree to begin an investigation into this matter, the Court likewise concludes that Plaintiff's claim fails as a matter of law. Plaintiff has not offered any evidence to show that the alleged retaliatory investigation did not advance legitimate goals of the institution. To the contrary, the referral and subsequent investigation of this matter by Internal Affairs was necessary to assist Plaintiff in bringing her claims and to assist the institution in determining the most effective way to handle Plaintiff's claims. *See Carrigan,* 957 F.Supp. at 1386 n. 11. By

investigating this incident, the Administrative Defendants were obtaining information they could use to better protect the inmates and were attempting to enforce the prison's policies aimed at protecting both guards and inmates. Indeed, had the Administrative Defendants failed to investigate the circumstances of Plaintiff's pregnancy they would have been turning a blind eye to improper conduct in the prison—an action which surely would have given rise to a claim of deliberate indifference. Because Plaintiff has failed to establish a constitutional violation based on her allegations of retaliation, the Court concludes that the Administrative Defendants are entitled to qualified immunity on Plaintiff's retaliation claims.

## II. Whether Plaintiff's Claims Related To The Birth Of Her Son, Christopher Daniels, Should Be Dismissed

In addition to the claims made by Plaintiff on her own behalf, Plaintiff also brings this action on behalf of her minor child, Christopher Daniels. Specifically, in Counts VII, XII and XV, Plaintiff alleges that as a result of Defendant Hawkins conduct, individually and/or being aided or abetted by the acts and/or omissions of the Administrative Defendants, Christopher Daniels was "born out of wedlock in prison and will be forced to suffer (a) shame and humility, (b) estranged relationship with his father, (c) separation from his mother, [and] (d) continuous public scorn and social stigma."

■ A claim by a parent for damages arising from the birth of a child is known as a claim for "wrongful birth." *Garrison v. Medical Center of Delaware,* 581 A.2d 288, 289 n. 1 (Del.1989). A claim brought on behalf of a child for the child's birth and premised on the notion that the child would have been better off had he or she not been born is known as a claim for "wrongful life." *Id.* It is well-established

under Delaware law, that claims of wrongful life are not judicially cognizable. *Garrison*, 581 A.2d at 293. Moreover, it is generally recognized that damages for shame, humiliation, an estranged relationship with his father, separation from his mother and public scorn and stigma are not recoverable.[8] 62A Am.Jur.2d § 100 (1990). Accordingly, Plaintiff's claims brought on behalf of her son for her son's birth will be dismissed.

As for Plaintiff's claim on her own behalf for damages resulting from the birth of her son, Plaintiff contends that her claim should not be dismissed because her claim is analogous to the claim recognized by the Delaware Supreme Court in *Garrison v. Medical Center of Delaware*, 581 A.2d 288 (Del.1989). Modifying its previous decision in *Coleman v. Garrison*, 349 A.2d 8 (Del.1975) which concluded that claims of wrongful birth are precluded by public policy, the *Garrison* court recognized a limited cause of action for the parents of a child born with a genetic defect where the health care provider's negligence deprived them of the opportunity to accept or reject the child's birth. In *Garrison*, the parents of a child born with Down Syndrome brought a medical malpractice action against their health care providers for negligence in performing and timely reporting the results of a prenatal chromosome study. Distinguishing *Coleman* which involved the unwanted birth of a normal, healthy child as a result of a doctor's negligence in performing a sterilization procedure, the *Garrison* court concluded that the measure of damages for the birth of a child with Down Syndrome were not speculative and recovery of such damages was not contrary to public policy. The court stated:

> As a result of being denied the option of abortion, the parents face ascertainable damages in the form of the additional financial burden of raising a child with Down's Syndrome, an amount far exceeding the cost of raising a normal child, the difference being the measure of the parents' recoverable damages.

*Id.* at 291. Consistent with this rationale, the court concluded that the parents could recover the extraordinary expenses of caring for, maintaining and educating the child to the extent that such costs exceeded the usual costs of raising an unimpaired child. *Id.* at 292.

While the *Garrison* decision modified the *Coleman* decision, it did not overrule it entirely. Indeed, the Court recognized the continuing viability of the *Coleman* decision as it pertained to the recovery for the cost of raising a normal, healthy child. Reaffirming its holding in *Coleman*, the *Garrison* court stated:

> [There are] no provable damages when a normal child is born to parents not desiring the birth of a child. The problem of proof lay in balancing the value and enjoyment to the parents of the unwanted life against its costs. "A child is born—how can it be said within the ambit of legal predictability that the monetary cost of that life is worth more than its value?"

---

8. Delaware courts have yet to address this precise issue. However, other jurisdictions have concluded that such damages are not recoverable. *See e.g. Lloyd v. Howard*, 566 So.2d 424 (La.Ct.App.1990) (addressing claims by child of inmate who was born from rape of inmate by other inmates and dismissing action for emotional damages based on illegitimacy); *Foy v. Greenblott*, 141 Cal. App.3d 1, 190 Cal.Rptr. 84, 94 (1983) (addressing claim by incompetent mother and son conceived in mental health facility and holding that injury of being born to mother who cannot properly care for child is not actionable); *Williams v. State*, 18 N.Y.2d 481, 276 N.Y.S.2d 885, 223 N.E.2d 343 (1966) (addressing claims by child born out of wedlock to mentally deficient mother who was sexually assaulted while confined in state mental institution and dismissing claims for damages based on child's illegitimate status and his deprivation of normal childhood, home life and proper parental care).

*Garrison,* 581 A.2d at 291 (quoting *Coleman,* 349 A.2d at 12).

■ Plaintiff contends that her claim is more closely related to *Garrison* than to *Coleman,* because Plaintiff is borderline retarded with an IQ of 80 and a social age of 16. Because of her intellectual and emotional limitations, Plaintiff argues that her son may also be of limited intelligence and developmentally disabled. Plaintiff further points out that her child will be in foster care because she is in prison. Plaintiff argues that such a living situation may create further emotional problems for the child. (D.I. 59 at 44).

The problem with Plaintiff's argument is precisely the same problem as the Delaware Supreme Court addressed in *Coleman,* namely that Plaintiff's alleged damages are entirely speculative. Indeed, Plaintiff has offered no evidence that her son is anything other than a healthy, normal child. As such, Plaintiff's claims do not fall within the limited circumstances described by the *Garrison* court. Accordingly, Plaintiff's claims relating to the birth of her son will be dismissed for failure to state a claim upon which relief may be granted. *Coleman,* 349 A.2d at 12.

## CONCLUSION

For the reasons discussed, the Administrative Defendants' Motion For Summary Judgment (D.I.95) will be granted.

An appropriate Order will be entered.